J-A22020-20

2021 PA Super 39

| | | |
|---|---|---|
| TAMMY M. RUFF, A/K/A TAMMY SHIFFLETT, EXECUTRIX OF THE ESTATE OF LINDA J. SHIFFLETT | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| YORK HOSPITAL | : | No. 2015 MDA 2019 |

Appeal from the Judgment Entered December 16, 2019
In the Court of Common Pleas of York County Civil Division at No(s):
2015-SU-002378-82

BEFORE:  SHOGAN, J., STABILE, J., and MURRAY, J.

OPINION BY SHOGAN, J.:                    **FILED MARCH 12, 2021**

Appellant, Tammy M. Ruff, also known as Tammy Shifflett, executrix of the estate of Linda J. Shifflett ("Shifflett"), appeals from the December 16, 2019, entry of judgment after a jury trial culminated in a defense verdict for York Hospital ("York").  In her appeal, Appellant challenges the trial court's December 9, 2019 order denying her post-verdict motions for judgment notwithstanding the verdict ("JNOV") and for a new trial, and the August 26, 2019 order resolving pretrial motions.  After careful review, we affirm.

On May 24, 2014, Shifflett presented to the emergency room at Hanover Hospital ("Hanover") complaining of shortness of breath.  Dr. Michael Denney, Hanover's emergency department physician, determined that Shifflett had an acute coronary syndrome that required further evaluation.  Denney

Deposition, 8/2/17, at 2–4.[1]  Denney was concerned about Shifflett's cardiac condition and stability and requested that she be transferred to York for treatment.  One reason for the transfer was that Shifflett might require a heart catheterization which Hanover was not equipped to perform.  *Id*. at 4.

Dr. Lyle Siddoway, a physician employed by Cardiac Diagnostics Associates ("CDA"), was the cardiologist on call when Shifflett was transferred to York.  Siddoway Deposition, 4/5/16, at 6.  Siddoway recalled that Denney advised him that Shifflett "had a small heart attack and that she had some fluid apparent on her chest X-ray and it looked like she had congestive heart failure."  *Id.* at 7.  Upon examination, Siddoway determined that Shifflett's congestive heart failure and respiratory weakness contra-indicated that she was stable enough to undergo a catheterization procedure that day.  *Id.* at 8.

During the following week, Siddoway and another CDA cardiologist, Dr. Gregory Fazio, monitored Shifflett and continued to conclude that the risks of catheterization outweighed the benefit of performing the procedure.  Siddoway Deposition, 4/5/16, at 17: Fazio Deposition, 3/29/16, at 20.  On June 1, 2014, Shifflett went into cardiogenic shock.  Dr. Jay Nicholson Deposition, 4/5/16, at 36.  A catheterization was performed revealing coronary artery blockage, and bypass surgery was performed.  *Id.* at 56.  Shifflett died on June 7, 2014.

_____

[1]  At trial, Appellant presented the testimony of Denney and ten other healthcare providers by playing their video depositions on September 24, 25, 2019.

Appellant filed a complaint on July 14, 2015, an amended complaint on August 31, 2015, and a second amended complaint on May 24, 2016, alleging wrongful death and survival claims. The second amended complaint included two counts of corporate liability against York; two counts of vicarious liability against York; two counts of vicarious liability against CDA; and two counts of negligence against Siddoway. Specifically, Appellant claimed that Siddoway and CDA were negligent for failing to perform a timely cardiac catheterization. Appellant's corporate negligence claim against York was based upon its purported failure to properly supervise the cardiologists, which contributed to a negligently-timed cardiac catheterization. Appellant further alleged that York was vicariously liable for the actions of its hospitalists, intensivists, and CDA cardiologists regarding the timing of the cardiac catheterization.

On June 6, 2017, Appellant's claim against Siddoway was dismissed with prejudice. On February 26, 2018, Appellant stipulated that she was discontinuing her outstanding claims against CDA. The trial court ordered the dismissal of CDA on February 28, 2018.

There were numerous pretrial motions including motions for summary judgment, motions for discovery, and motions *in limine.* Trial commenced on Monday, September 23, 2019, solely on the corporate negligence claim against York. On September 30, 2019, the jury returned a defense verdict in favor of York. Appellant filed post-trial motions requesting a new trial and JNOV. Appellant also challenged the trial court's pretrial decisions, its evidentiary rulings during trial, and alleged error in the jury instructions. The

trial court denied the post-trial motions on December 9, 2019. Judgment was entered against Appellant on December 16, 2019, and this appeal followed.

Appellant raises three issues on appeal:

A. Did the Lower Court Commit a Reversible Error By Denying Appellant's Motion for A New Trial and Judgment NOV?

B. Did the Trial Court Commit Reversible Error Requiring A New Trial Because of An Incomplete Understanding of the Requirements of the Hospital's Direct Institutional Corporate Negligence By Refusing To Give Plaintiff's Instructions That Were Filed In the Prothonotary's Office On September 23 and September 27, 2019 That Contained Correct and Relevant Statements of Law That Were Not Covered By the Court's Charge As A Whole?

C. Did the Trial Court Commit Reversible Error Requiring A New Trial Because of An Incomplete Understanding of the Requirements of the Hospital's Direct Institutional Corporate Negligence By Granting York Hospital's Pre-Trial Motions *In Limine*?

Appellant's Brief at 6 (*verbatim*).

Our standard of review of an order denying JNOV is whether, viewing the record in the light most favorable to the verdict winner and granting the benefit of every favorable inference, "there is sufficient competent evidence to support the verdict." ***Tillery v. Children's Hosp. of Philadelphia***, 156 A.3d 1233, 1240 (Pa. Super. 2017) (citation omitted). Any conflict in the evidence is resolved in the verdict winner's favor. ***Id.*** JNOV may be granted only in clear cases where the facts are such that no two reasonable minds could fail to agree that the verdict was improper. We will disturb a trial court's grant or denial of JNOV "only for an abuse of discretion or an error of law."

*Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1074 (Pa. 2006) (citation omitted). Additionally,

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the [factfinder's] verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> > Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*In re M.B.*, 228 A.3d 555, 566 (Pa. Super. 2020) (quoting *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal citations, quotations, and emphasis omitted)).

- 5 -

Corporate negligence is a doctrine under which a hospital owes a direct duty to its patients to ensure their safety and well-being while in the hospital. *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991) (adopting the corporate negligence doctrine in Pennsylvania jurisprudence). Under a corporate negligence theory, four general, non-delegable duties are imposed on the hospital:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;
>
> (2) a duty to select and retain only competent physicians;
>
> (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and
>
> (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Id.* at 707 (citations omitted).

In *Welsh v. Bulger*, 698 A.2d 581 (Pa. 1997), the Pennsylvania Supreme Court held that:

> corporate negligence is based on the negligent acts of the institution. A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees. Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts.

*Welsh*, 698 A.2d at 585. (citations omitted). The *Welsh* Court further explained: "To establish a claim for corporate negligence against a hospital, a plaintiff must show that the hospital had actual or constructive knowledge of the defect or procedures that created the harm." *Id.* (citation omitted).

- 6 -

Moreover, "to make out a viable *Thompson* claim, a plaintiff must prove that [the] hospital knew or should have known of the mistake or deficiency." *Whittington v. Episcopal Hospital*, 768 A.2d 1144, 1154 (Pa. Super. 2001) (citing *Edwards V. Brandywine Hospital*, 652 A.2d 1382, 1387 (Pa. Super. 1995)). In a corporate negligence action against a hospital, the element of actual or constructive notice is critical because "the corporate negligence doctrine contemplates a kind of systemic negligence in the actions and procedures of the hospital itself rather than in the individual acts of its employees." *Kennedy v. Butler Memorial Hospital*, 901 A2d 1042, 1045 (Pa. Super. 2006) (quotation omitted).

Appellant asserts that she is entitled to a new trial and/or JNOV on her corporate negligence claim because the evidence established that: 1) York delegated its non-delegable duties to CDA; 2) York's operating rules did not establish that York accepted its responsibility to ensure Shifflett's safety; and, 3) York failed to supervise the physicians responsible for Shifflett's care. Appellant's Brief at 22–23. Appellant further contends that the eight-day delay in diagnosing Shifflett's coronary artery disease, specifically, the failure to earlier perform a cardiac catheterization, resulted in a second heart attack that caused Shifflett's death. *Id.* at 23.

The trial court resolved Appellant's motions for JNOV and for a new trial in its order denying Appellant's post-trial motion, as follows:

> First, [Appellant] argues that the verdict was contrary to the weight of the evidence. The [c]ourt had the opportunity to listen

to [Appellant's] testimony, [Appellant's] expert's testimony, and the testimony put on by the defense. Quite frankly, there is nothing about the verdict in this particular case that shocks the court's sense of justice in this matter.

In fact, the [c]ourt struggled with a defense motion for a directed verdict on the issues of reckless conduct and factual causation given the fact that the [c]ourt heard no testimony that would indicate that [York's] conduct in this case was reckless, as that term is defined in the law, and we have difficulty determining how [Appellant's]/ [Shifflett's] care would have been any different if there was a finding of corporate negligence.

Clearly, in this case the jury heard not only from the [Appellant's] expert but also from the defense. The jury heard the defense view of what [York] did in order to oversee patient safety, and the jury was free to draw its own conclusions, which are fully supported by the evidence in the case, that [York] was not negligent.

With regard to the duties imposed on [York], maintenance of safe and adequate facilities, the [c]ourt in its jury instruction noted that the emphasis was more on the last of the two duties rather than the former because, quite frankly, the [c]ourt did not hear any credible evidence that would indicate that the catheterization lab was not safe, was not adequate for the function it was supposed to serve, and there was undisputed testimony offered by the defense that it was available, if needed, on a 24-hour, 7-day-a-week basis.

With regard to the duty to oversee all persons who practice medicine, again, the jury was free to accept or reject the defense testimony that the policies that were in effect were designed to do that, and the jury obviously rejected [Appellant's] theory or accepted the defense expert testimony on that issue.

And, finally, the same can be said for the formulation, adoption, and enforcement of adequate rules and policies to ensure quality care for patients. [Appellant] rests its argument principally on the fact that there was a delay in diagnosing the [Appellant's]/[Shifflett's] condition that directly led to her death. However, again, this [c]ourt, even assuming that there was a delay in diagnosis, and by no means is the record free from dispute on that, we are at a loss to determine how the delay in

diagnosis would have altered the course of care that the jury heard about from the respective experts who testified before them.

Also, in support of [Appellant's] request for a new trial based on the weight of the evidence, short of having another doctor stand over the shoulder of every attending physician, hospital employee, or other healthcare provider and second-guessing the care on behalf of the hospital, we are not sure how a hospital is expected to comply with the standard of care that [Appellant] would have us adopt in cases such as this.

Accordingly, we cannot conclude that the verdict is against the weight of the evidence, and we will deny the request for a new trial on that basis.

Order Denying Post-Trial Motion, 12/9/19, at 2–4.

The trial court further explained:

[Appellant] posits that the jury's verdict was not supported by proven facts. In fact, [Appellant's] counsel chooses to believe his version of the evidence and discount [York's] case. Such is not the standard for the grant of a new trial or judgment NOV.

\* \* \*

The fact that the jury apparently rejected [Appellant's] idea of what constitutes adequate "supervision" is not a basis for disturbing its verdict, when that verdict is supported by competent evidence. . . .

[Appellant] seems to think that the only supervision which will pass muster under the ***Thompson v. Nason Hospital*** standard is to have a hospital employed "super doctor" standing beside each attending physician and second-guessing the practice and procedures. We do not read ***Thompson*** as requiring that.

Trial Court Opinion, 1/21/20, at 3–4 (record reference omitted).

On appeal, Appellant initially argues the trial court should have assessed

her motion for a new trial and for JNOV under the principles outlined in the

Restatement (Second) of Torts, Sections 328B and 328C.[2] Appellant has waived review of this argument for three reasons. First, there is no reference to Sections 328B and 328C of the Restatement (Second) of Torts in Appellant's twenty-four-page Pa.R.A.P. 1925(b) statement. Any issues not raised in a Rule 1925(b) statement are deemed waived. **U.S. Bank, N.A. for Certificateholders of LXS 2007-7N Tr. Fund v. Hua**, 193 A.3d 994, 997 (Pa. Super. 2018); Pa.R.A.P. 1925(b)(4)(vii). Second, Appellant failed to provide citation to the record where her argument advocating applicability of the Restatement principles was presented to the trial court. Pennsylvania Rule of Appellate Procedure 2119(c) requires that a brief provide citation to the record when "reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record[.]" Pa.R.A.P. Rule 2119(c). Therefore, the claim is waived for this additional reason. **See J.J. DeLuca Co. v. Toll Naval Associates**, 56 A.3d 402, 413 (Pa. Super. 2012) (claim waived for purposes of appeal when the appellant failed to present any citation to the record to support its claim). Finally, because Appellant's argument that the trial court erred in not determining, in the first instance,

---

[2] In general, Section 328B of the Restatement (Second) of Torts requires trial courts "to determine whether, upon facts in evidence which the jury may reasonably find to be true, the law imposes upon the defendant any legal duty to act or refrain from acting for the protection of plaintiff." Restatement (Second) of Torts § 328B, cmt. The jury is then tasked to determine "the facts," "whether the defendant has conformed to the standard of care," "whether the defendant's conduct caused the harm, and "[t]he amount of compensation for legally compensable harm." **Id.** at § 328C.

whether the facts in evidence imposed a legal duty upon York to act for the protection of Shifflett, advances a different legal theory than that presented at trial and post-trial, this claim is waived on appeal. *See Andrews v. Cross Atlantic Capital Partners, Inc.*, 158 A.3d 123, 129 (Pa. Super. 2017) (claim waived when the appellant's argument on appeal advanced a different legal theory than that offered at trial and post-trial); *see also* Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

The foundation of Appellant's preserved appellate argument is that York wrongly delegated its non-delegable corporate duties to CDA. To support this argument, Appellant refers to the Cardiology and Physician Management Services Agreement executed on April 24, 2014, between York and CDA providing, in part:

> In performing its responsibilities pursuant to this Agreement, it is understood and agreed that CDA is at all times acting as an independent contractor of [York], and CDA and the CDA physicians are not partners, joint-venturers, or employees of [York]. [York] shall neither have nor exercise any control or direction over the medical judgment of the CDA physicians or over the methods or manner by which the CDA physicians provide professional services to patients under this Agreement. Instead, [York's] interest and purpose in entering into this Agreement is to ensure that the professional services offered at the Facilities and covered by this Agreement are performed and rendered in a competent, efficient, and satisfactory manner.

Cardiology and Physician Management Services Agreement, 4/24/14, at ¶ 4.1; Joint Exhibit J-50. Appellant asserts that the terms of this agreement and the testimony of Dr. Kevin McCullum, president of CDA, stating that CDA

establishes the hours of operation of the catheterization lab at York and representing that a patient's need for a cardiac catheterization is a judgment call made by the cardiologist "created irrefutable proof that [York] was corporately negligent in failing to ensure" Shifflett's safety. Appellant's Brief at 31.

This Court's reasoning in **Scampone v. Grane Healthcare Company**, 169 A.3d 600 (Pa. Super. 2017), repudiates Appellant's underlying premise that York was precluded from delegating some of its duties to CDA. The **Scampone** Court explained:

> the designation "non-delegable duty" is a misnomer. **Kennedy v. Robert Morris Univ.**, 133 A.3d 38, 44 (Pa. Super. 2016). A principal can always delegate or assign its performance of a non-delegable duty. The term "non-delegable duty" merely means that the principal retains legal responsibility for the undertaking of the person/entity to which the principal assigned the non-delegable duty if the entity acted negligently. **Id**.

**Scampone**, 169 A.3d at 621. Thus, contrary to Appellant's position, **Scampone** sanctions York's delegation of certain matters related to cardiac care to CDA. York, however, remains legally responsible if CDA acts negligently in performing the delegated duties. **Id.** As the question of CDA's and/or Siddoway's negligence was not before the jury, Appellant cannot prevail in her argument that York's delegation of cardiac care responsibility to CDA amounted to corporate negligence.

The conclusion that York was permitted to delegate some of its duties does not, however, absolutely relieve York from its **Thompson** obligations to

maintain safe and adequate facilities and equipment, to oversee those practicing medicine as to patient care, and to formulate and enforce policies to ensure patient care. **Thompson**, 591 A.2d at 707. Thus, we turn to Appellant's allegations that York breached each of these duties in regard to Shifflett's care.

Appellant first claims that York breached its non-delegable duty to maintain safe and adequate facilities and equipment because "there were no rules concerning the times and safe use and availability of the diagnostic cardiac catheterization lab at [York]." Appellant's Brief at 34. Appellant bases this allegation on the fact that testimony revealed that routine catheterizations were not normally scheduled for evenings or on holidays and weekends. N.T., 9/24/19, at 303. However, there was sufficient evidence presented at trial that the cardiac catheterization lab was available to Shifflett throughout her hospitalization if a cardiologist thought the procedure was prudent given her underlying respiratory issues. McCullum testified that cardiac catheterizations could be performed twenty-four hours a day, seven days a week, including at night, on weekends, and during holidays, as necessary. **Id.** at 306; **see also** Dr. John Bobin Deposition, 3/29/16, at 4 (York did not prohibit providers from performing cardiac catheterizations after-hours, on weekends, or during holidays; Dr. Paul Tolerico Deposition, 3/23/16, at 8 (if a catheterization "needs to be done, it gets done"); Dr. George Robinson Deposition, 6/30/17, at 18 ("I've had many a catheterization done on weekends, holidays, nights.").

Given this uncontradicted testimony, the trial court's conclusion that it did not hear "any credible evidence that would indicate that the catheterization lab was not safe, was not adequate for the function it was supposed to serve, and there was undisputed testimony offered by the defense that it was available, if needed, on a 24-hour, 7-day-a-week basis" was not an abuse of discretion warranting JNOV or a motion for a new trial. Order Denying Post-Trial Motion, 12/9/19, at 3.

Appellant also contends that York breached its duty to oversee Shifflett's cardiac care. Specifically, Appellant claims that York's failure to "monitor and oversee the medical care of . . . Shifflett at the point of care so as to obtain and require a timely, definitive diagnosis of her obstructive coronary artery disease" constituted a diagnostic error causing Shifflett's death. Appellant's Brief at 39–40. Appellant refers to the testimony of Keith Noll, President of York Hospital, that York was "not in the business of supervising the medical judgment of our doctors . . . ." *see*, N.T., 9/27/19, at 581, and of York's expert, Dr. Mary Cooper, explaining the difference between "supervision" and "oversight." N.T., 9/27/19, at 550. Cooper represented that a situation where a hospital would overrule "the clinical judgment of the physician is unheard of in health care." *Id.* at 557. Appellant maintains that these witnesses' statements constituted evidence that York violated the duty to "oversee all persons who practice medicine within its walls as to patient care." *Thompson*, 591 A.2d at 707. However, Appellant has offered no authority,

nor has our independent research discovered, any decision interpreting ***Thompson's*** oversight duty to mandate that a hospital direct or override a physician's clinical judgment. Instead, ***Scampone*** instructs that hospitals are legally responsible on a theory of corporate negligence if the person assigned the ***Thompson*** duty acted negligently. ***Scampone***, 169 A.3d at 621. As noted, the alleged negligence of CDA or its physicians was not an element presented in Appellant's case.

Appellant also offers that her expert, Dr. Kevin Brady, opined that York breached its oversight duty because the testimony of Shifflett's treating physicians required a conclusion that "nobody's in charge." N.T., 9/24/19, at 279. To the contrary, the evidence introduced at trial demonstrated that York met its duty to oversee the practitioners in the hospital, including CDA's cardiologists. Dr. Allen Birenberg testified that in his position as York's Vice-President of Medical Affairs, it was his responsibility to "ensur[e] that [York's] physicians, [York's] medical staff, adheres to the highest qualities and comports themselves to the medical staff rules, regulations, bylaws, hospital policies, and the like." N.T., 9/27/19, at 471. Birenberg also related that he "make[s] sure that [York has] monitoring systems in place to make sure that there is the degree of oversight and supervision of that kind of care through a variety of mechanisms, looking at data to make sure that our teams are really performing at a high level." ***Id***. Birenberg further explained York's oversight of the medical staff:

Some of them are electronic. Some of them are through policies and procedures. Some of that is through direct observation. Some of that is just having a culture of safety. Everything they do is scrutinized. Everything they do is done, not in a vacuum, it is done within a system of care that itself has been designed to ensure safe care and protecting the welfare of our patients.

*Id.* at 493. Additionally, Birenberg described the credentialing process for physicians, the professional review process, review of physician outcomes, the peer review process, and the continuous evaluation of the medical staff. *Id.* at 471–477.

Mr. Noll's testimony likewise detailed York's oversight. As president of York, Noll stated that he reports to the hospital board twice a month on matters of "quality and safety." N.T., 9/27/19, at 575–576. He also informed the jury that hospitals are legally required to have two branches operating in a hospital—oversight of the medical staff headed by Birenberg, and Noll's branch which "provide[s] the resources, structure, system, and personnel to support the physicians in that quality and safety journey." *Id.* at 577.

Clearly, the jury accepted the testimony of York's witnesses that it fulfilled its oversight duty and rejected Appellant's position that the hospital was charged with mandating or superseding physicians' clinical judgment. This determination was well within the jury's province to assess the credibility of the witnesses and will not be disturbed when, as here, the jury's decision is supported by the record. *Griffin v. University of Pittsburgh Medical Center-Braddock Hospital*, 950 A.2d 996, 999 (Pa. Super. 2008) (credibility

determinations are for the jury as factfinder and the court must not substitute its own judgment on these issues.) (quotation omitted)).

Appellant also avers that York's operating rules and Patient Safety Program were legally deficient. Appellant particularly criticizes the "Just Culture" paragraph in the Patient Safety Program which recommends that hospital staff are to be treated fairly "to be consoled for human errors, coached for at-risk behaviors, and disciplined for reckless choices." Joint Exhibit 6 at 6. Appellant asserts that the adoption of the "Just Culture" language demonstrated that York did not have a system to protect Shifflett from the delay in diagnosing her cardiac condition. Appellant's Brief at 45. Appellant also points to the opinion of Brady, who reviewed York's Patient Safety Program and concluded that "[t]here were no policies and procedures involved in the risk stratification, which is extremely important for a safety program." N.T., 9/24/19, at 277; Appellant's Brief at 45.

To rebut Appellant's assertion that York's safety rules and procedures did not meet the ***Thompson*** standard, York offered testimony from its now-retired Patient Safety Officer, Gary Merica,[3] President Noll, and its expert in quality care and patient safety, Cooper. Merica described the policies and procedures that York had in place to ensure patient safety with "an overarching approach to safety, investigation of events." N.T., 9/25/19, at

_____

[3] Gary Merica was employed as York's Patient Safety Officer at the time of Shifflett's hospitalization. N.T., 9/25/19, at 352.

358. He explained that the patient safety plan consisted of "literally hundreds" of hospital-wide rules and policies, as well as individual policies for staff within the various departments of the hospital. *Id.* at 402, 408–409. Although Merica acknowledged that York's policy does not specifically instruct its medical personnel to refrain from "negligence," its safety policies require "employees, physicians and so forth to use sound judgment" and keep patients safe. *Id.* at 361. He further informed the jury that the Department of Health would approve a hospital's license only if its safety policies were appropriate and that York has always been approved for a license. *Id.* at 367. President Noll also testified that the hospital's safety policies complied with relevant safety laws. N.T., 9/27/19, at 581.

Cooper opined that York "had a comprehensive safety plan, an event reporting system, an oversight of the physicians, the nurses, the clinical staff within the hospital, all the pieces in place of that patient safety plan that would prevent and/or respond to errors in the hospital." N.T., 9/27/19, at 556–557. She further stated that York "adhered to the standard of care for [Shifflett], and with reasonable certainty as a professional in health care quality and safety, I can say that they did everything they could in order to assure her a high quality, safe outcome." *Id.* at 512.

As with the evidence concerning York's duty to supervise, the jury credited the testimony of York's witnesses that York established and enforced effective safety policies and chose not to accept Appellant's position that the

"Just Culture" aspect of the safety plan negated the efficacy of York's safety rules and procedures.[4] Such determinations of witness credibility were within the jury's function and will not be disturbed. *Griffin*, 950 A.2d at 999.

In summary, the evidence at trial demonstrated that York complied with the dictates of *Thompson* and fulfilled its corporate duties. Because sufficient competent evidence supported the verdict that York was not corporately negligent, the trial court's denial of Appellant's motion for JNOV was not an abuse of discretion. Moreover, because we agree with the trial court that the verdict was not contrary to the weight of the evidence, the trial court did not abuse its discretion in denying Appellant's motion for a new trial.

Appellant next contends that the trial court's instruction on corporate negligence was incomplete and misled the jury. The gist of Appellant's objection to the trial court's jury instruction is that it failed "to give the correct and complete statements of law concerning the hospital corporate negligence doctrine . . . ." Appellant's Brief at 50. Specifically, Appellant asserts that the instruction was "incomplete" and "confusing" because it did not relay that York's "negligence alone can establish responsibility for any harm caused to [Shifflett]." *Id.* at 53.

---

[4] We note that the "Just Culture" language cited with disfavor by Appellant consisted of one paragraph in the York Patient Safety Plan, the stated purpose of which was to "ensure that a culture of patient safety, blameless reporting of patient safety concerns, coupled with a systematic, coordinated and continuous approach to patient safety are the standards of every employee." Patient Safety Program; Joint Exhibit 6.

In examining jury instructions, our scope of review is to determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. "[A] charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission which amounts to fundamental error." **Sensenich v. Morcos,** 205 A.3d 375, 381 (Pa. Super. 2019) (quotation omitted).

As previously outlined, the doctrine of corporate negligence is a basis for hospital liability separate from the liability of the practitioners who rendered medical care to a patient. **Whittington**, 768 A.2d at 1149. A hospital is directly liable under the doctrine of corporate negligence if it fails to uphold any of four duties, three of which are at issue in the instant matter—to use reasonable care in the maintenance of safe and adequate facilities and equipment; to oversee persons who practice medicine within the hospital as to patient care; and "to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients." **Rauch v. Mike-Mayer**, 783 A.2d 815, 826–827 (Pa. Super. 2001) (quoting **Thompson**, 591 A.2d at 707–708). Thus, for the court's instruction on corporate negligence to pass muster, it must inform the jury that York is directly responsible and liable to Appellant if it breached any of its four duties.

The trial court herein instructed the jury on the doctrine of corporate negligence, as follows:

As far as negligence is concerned, a hospital is directly liable to the patient if it violates a duty that the hospital owes to the patient to ensure the patient's safety and well-being while under the care of the hospital. The following are the duties that a hospital must fulfill and that it cannot pass onto anyone else:

A duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

A duty to select and retain only competent physicians and other health care providers;

A duty to oversee all persons who practice medicine, including nursing and cardiac care, within its walls as to patient care;

And, finally, a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the patients.

If you decide that [York] violated any one of those duties, and here we're focused mainly on the last two, to formulate, adopt, and enforce adequate rules and policies to ensure quality care, and to oversee all persons who practice within its walls, then you must decide whether [York] knew or under the circumstances should have known of the breach of that duty, and, second, that the conduct was, again, what we call a factual cause in bringing about the harm or injury to [Shifflett].

Now, [Appellant] need not prove that an individual doctor, nurse, or other individual health care provider was negligent. In deciding the issue of corporate negligence, you must evaluate the conduct of [York] on its own merits.

\* \* \*

In order for [Appellant] to recover damages . . . [York's] negligence must have been what we call a factual cause in bringing about the harm. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct that is complained about.

To be a factual cause, the conduct must have been an actual real factor in causing the harm even if the result is unusual or unexpected.

\* \* \*

- 21 -

To be a factual cause, a particular Defendant's conduct need not be the only factual cause. The fact that some other causes concur with a Defendant's negligence in producing an injury does not relieve that Defendant from liability as long as the Defendant, hospital's, own negligence is a factual cause of the injury.

When [York] negligently fails to act or negligently delays in taking indicated diagnostic or therapeutic steps and that negligence is a factual cause of injuries to [Shifflett . . ., York] is responsible for the injuries caused. Where [Appellant] presents expert testimony that the failure to act or delay on the part of [York] has increased the risk of harm to [Shifflett], this testimony, if found credible, provides a sufficient basis from which you can find that the negligence was a factual cause of the injury sustained.

N.T., 9/30/19, at 715–719.

The trial court's instruction was more than sufficient in its description of corporate negligence. It plainly explained that York could be directly responsible for Shifflett's injuries if it breached any of its duties owed to her, detailed those duties, and clarified that York must have had notice, actual or constructive, that one or more of the duties had been breached. We further observe that the trial court's jury instruction conformed to the Pennsylvania Suggested Civil Jury Instruction on corporate negligence.[5] Accordingly,

_____

[5] The suggested instruction reads:

A health-care institution is directly liable to the patient if it violates a duty that it owes to the patient to ensure the patient's safety and well-being while under the care of the healthcare institution. The following are the duties that a health-care institution must fulfill and that it cannot pass on to anyone else.

Appellant's contention that the corporate negligence instruction was inadequate is without merit.

Appellant also challenges certain aspects of the trial court's pretrial ruling on York's motion *in limine*. When reviewing a trial court's ruling on a motion *in limine,* this Court applies an evidentiary abuse of discretion standard

---

> a. a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; and/or
>
> b. a duty to select and retain only competent physicians/health-care personnel/administrators; and/or
>
> c. a duty to oversee all persons who practice nursing/other relevant person's health care within its walls as to patient care; and/or
>
> d. a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the patients.
>
> If you decide that the defendant violated any one of those duties [specify which duty or duties are applicable], you must then decide
>
> a. whether the health-care institution knew or should have known of the breach of that duty, and
>
> b. that the conduct was a factual cause in bringing about the harm or injury.

Pennsylvania Suggested Civil Jury Instruction §14.70 (2020). While we recognize that the Suggested Jury instructions are not binding on trial courts, they are instructive nonetheless. **Gorman v. Costello**, 929 A.2d 1208, 1213 (Pa. Super. 2007).

of review. *Dibish v. Ameriprise Financial, Inc.*, 134 A.3d 1079, 1095 (Pa. Super. 2016) (quotation omitted). Appellant first argues that the trial court erred when it granted York's motion to enforce the stipulation between Appellant and CDA dismissing CDA from the lawsuit. The stipulation provided: "All parties agree and stipulate that CDA shall hereby be dismissed with prejudice from this action and the remaining parties will not present evidence at trial that the cardiology care by its agents was negligent." Stipulation, 2/26/18, at 2. The stipulation further stated that "the parties will not present evidence at trial that the cardiology care by [CDA cardiologists] was negligent." On July 23, 2019, York filed a motion *in limine* requesting the court to enforce the stipulation and exclude any evidence of CDA's alleged negligence. The trial court granted the motion and precluded Appellant from offering evidence of negligent failure to perform a cardiac catheterization. The court, however, noted:

> [York] still misconstrues that as indicating lack of negligence on [York]. [York] wants us to effectively preclude evidence of negligence by [York] in the establishment of its policies and procedures which allegedly precluded effective cardiac care, based on the stipulation which we read as precluding evidence that CDA's agents were negligen[t]. We conclude that [York's] request is too broad. As we understand [Appellant's] argument, it was the policies and procedures negligently established by [York] which prevented a catheterization from ever taking place which constitutes a basis for the claim of negligence against [York].

Order Resolving Pretrial Motions, 8/29/19, at 2–3.[6]

The trial court further explained its decision to enforce the stipulation:

[Appellant], apparently, bases its objection to the [c]ourt's pre-trial ruling on the fact that [Appellant] was precluded from offering evidence of negligent cardiac catheterization or, more accurately, lack of catheterization. [However, Appellant] was permitted to go into that quite extensively in its case, and, therefore, aside from the fact that [Appellant] agreed to refrain from doing so, we fail to see how [Appellant] was harmed by the [c]ourt's pre-trial ruling.

That argument also would tend to advance inconsistent theories of liability by [Appellant] by indicating that [Shifflett's] demise was caused by negligent lack of catheterization when it would appear that what [Appellant] is attempting to argue is lack of proper oversight by [York].

[Appellant] also makes the argument that the stipulation was contrary to public policy and should not be enforced. [Appellant] was the party who voluntarily entered into such stipulation. We think such contradiction in [Appellant's] position now is somewhat disingenuous with regard to that argument.

Order Denying Post-Verdict Motion, 12/4/19, at 6–7.

The trial court's ruling on the stipulation is sustainable in that the language of the stipulation was clear and would not confuse the jury. As Appellant clarified in her opening statement: "[w]e are making no claim against the doctors who treated [Shifflett]. Our claim is solely against York Hospital for failing to comply with the law and to comply specifically with the four duties that must be implemented to comply with the law." N.T., 9/24/19,

---

[6] Contrary to Appellant's position that the trial did not understand the contours of corporate negligence, this language indicates that the trial court had a comprehensive understanding of this theory of liability.

- 25 -

at 145. In accordance with Appellant's own statements at trial, the stipulation precluding evidence of CDA's or its cardiologists' negligence at trial was properly enforced.

York's motion *in limine* also requested the court to preclude Appellant's expert, Dr. Brady, from referring to the Pennsylvania Patient Safety Advisory published by the Pennsylvania Patient Safety Authority. The Authority was created under the Medical Care and Reduction of Error Act, 40 P.S. § 1303.301*, et seq*., related to the reduction of medical errors for the purpose of ensuring patient safety. Hospitals are not legally required to adopt the recommendations of the Authority. 40 P.S. § 1303.306.

The trial court granted the motion in part, ruling that Appellant's expert could not refer to the publication in its case in chief, but left open for trial whether he might reference the standards on cross-examination. Order Resolving Pre-Trial Motions, 8/25/18, at 3. In its Pa.R.A.P. 1925(a) opinion, the court responded to Appellant's allegation of error, as follows:

> Contrary to [Appellant's] assertion . . . we did not preclude [Appellant's] expert from referring to the document as a document relied upon by the expert. We did, however, preclude the document from coming into the record in its entirety. A party cannot use an expert to simply throw materials, including learned treatises, into the record. **Aldridge v. Edmunds**, 750 A.2d 292 (Pa. 2000). As the trial transcript shows, the expert was allowed to show that he relied on the document to formulate his opinion.

Trial Court Opinion, 1/21/20, at 4–5 (record reference omitted).

**Aldridge** instructs that because the purpose for which treatises may be referenced on direct examination is generally limited to explaining the reasons

- 26 -

underlying an expert's opinion, trial courts should exercise careful control over their use to prevent them from being made the focus of the examination. *Aldridge*, 750 A.2d at 297. In accordance with *Aldridge*, the trial court permitted Brady to testify that the Patient Safety Advisory was authoritative and that he relied upon it when rendering his opinion against York. N.T., 9/25/19, at 296. There was no abuse of discretion in this evidentiary ruling.

Appellant also argues that the trial court erred when it precluded Dr. Brady from testifying that York's behavior was reckless—a factor relevant to Appellant's claim for punitive damages. The trial court granted York's motion *in limine* barring the expert's testimony on recklessness, reasoning "Such matters are within the ability of lay jurors to judge and assess." Order Resolving Pretrial Motions, 8/29/19, at 3. The trial reiterated that rationale in its 1925(a) opinion:

> Expert testimony is permitted to help the jury understand matters which are beyond the understanding of the average layperson. Pa.R.Evid. 702(a). The purpose is to "help the trier of fact to understand the evidence or to determine a fact in issue." Pa.R.Evid. 702(b). Whether the actions of [York] were reckless has nothing to do with understanding the evidence or determining a fact in issue. It has to do with the application of the facts to the legal standards set forth by the [c]ourt. That determination is the exclusive province of the jury. The concept of "recklessness" is not beyond the grasp of the average layperson. *See Collins v. Zediker*, 421 Pa. 52, 56, 218 A.2d 776, 777 (1966).

Trial Court Opinion, 1/21/20, at 5–6.

The admission of expert testimony is governed by Pennsylvania Rule of Evidence 702, which reads in relevant part: "If the expert's scientific, technical

- 27 -

or other specialized knowledge beyond that possessed by a layperson . . . will help the trier of fact to understand evidence or to determine a fact in issue," that witness "qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." Pa.R.E. 702(b). Additionally, "[P]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *SHV Coal, Inc. v. Continental Grain Co.*, 587 A.2d 702, 704 (Pa. 1991) (quotation omitted). The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder. . . ." *J.J. Deluca Co.*, 56 A.3d at 416. Thus, the trial court properly ruled that permitting Dr. Brady to use the terms "reckless" and "outrageous" at trial would be inappropriate.

Finally, Appellant urges that the trial court erred when it refused to allow Brady to reference Pennsylvania law in his testimony. Appellant's Brief at 73. On this question, the trial court ruled:

> [York's] motion to preclude [Appellant's] medical expert from offering legal opinions is, generally, GRANTED. To the extent that the expert must incidentally mention standards of care which may be interpreted as "legal" in their nature, such will be permitted, subject to ruling on objections to the proffered testimony at the time of trial."

Order Resolving Pretrial Motions, 8/29/19, at 4.

The trial court specifically precluded Brady from testifying about the legal theory underpinning corporate negligence. The trial court explained:

[Appellant] further complains that we erroneously precluded her [expert] from testifying about:  a) whether conduct by [York] was reckless; and  b) by offering opinions about how conduct violated the law. . . .  Whether the actions of [York] were reckless has nothing to do with understanding the evidence or determining a fact in issue.  It has to do with the application of the facts to the legal standards set forth by the [c]ourt.  That determination is in the exclusive province of the jury.  The concept of "recklessness" is not beyond the grasp of the average layperson.  See *Collins v. Zediker*, 421 Pa. 52, 218 A.2d 776, 777 (1966).

Similarly, an expert not qualified as a legal expert cannot opine whether one's conduct complies with the law*.  Brown v. Commonwealth*, [843 A.2d 429, 433 (Pa. Cmwlth. 2004)].

Trial Court Opinion, 1/21/20, at 5–6.

The trial court's ruling was not an abuse of discretion.  Expert witnesses are not permitted to render legal opinions.  **Brown v. Commonwealth**, 843 A.2d 429, 433 (Pa. Cmwlth. 2004).[7]

For the above-stated reasons, the judgment in favor of York is affirmed.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/12/2021

---

[7]  "This Court is not bound by decisions of the Commonwealth Court.  However, such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate." **Petow v. Warehime**, 996 A.2d 1083, 1089 n.1 (Pa. Super. 2010).