J-E02003-23

2023 PA Super 262

| | | |
|---|---|---|
| LESLEY COREY, AS ADMINISTRATRIX OF THE ESTATE OF JOSEPH COREY, AND LESLEY COREY, IN HER OWN RIGHT | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | |
| WILKES-BARRE HOSPITAL COMPANY, LLC, D/B/A WILKES-BARRE GENERAL HOSPITAL, WILKES-BARRE GENERAL HOSPITAL EMERGENCY DEPARTMENT AND J. CHARLES LENTINI, M.D. | : : : : : : : | |
| v. | : : | |
| PENNSYLVANIA PHYSICIANS SERVICES, LLC | : : : : | |
| Additional Defendant | : | No. 507 MDA 2021 |

Appeal from the Judgment Entered March 24, 2021
In the Court of Common Pleas of Luzerne County
Civil Division at No(s): 2015-07551

BEFORE: PANELLA, P.J., BOWES, J., OLSON, J., DUBOW, J., KUNSELMAN, J., MURRAY, J., McLAUGHLIN, J., KING, J., and McCAFFERY, J.

OPINION BY KING, J.:                    **FILED: DECEMBER 11, 2023**

Appellant, Lesley Corey, as administratrix of the estate of Joseph Corey, and Lesley Corey, in her own right, appeals from the judgment entered in the Luzerne County Court of Common Pleas, in favor of Appellee, Wilkes-Barre

Hospital Company, LLC, d/b/a Wilkes-Barre General Hospital ("WBGH").[1]  We affirm the judgment and grant the application to dismiss Appellant's second issue, which was filed by the additional defendant, Pennsylvania Physicians Services, LLC ("PPS").

The relevant facts of this appeal are as follows.  On August 8, 2013, Joseph Corey ("Decedent") experienced chest pain and difficulty breathing.  During the early morning hours of August 9, 2013, Decedent called 911 and requested emergency medical assistance.  Ambulances responded to Decedent's house and transported him to WBGH, where Decedent was treated in the emergency department.  Approximately twelve (12) hours later, Decedent was transferred to Milton Hershey Medical Center ("MHMC").  On August 11, 2013, Decedent died at MHMC.

Appellant commenced this action by filing a *praecipe* for writ of summons on July 1, 2015.  On November 25, 2015, Appellant filed a complaint against WBGH.  The complaint included claims for wrongful death, a survival action, and corporate negligence.  The complaint also advanced a theory of

_____

[1] Appellant and J. Charles Lentini, M.D., reached a settlement prior to trial, and Dr. Lentini is not a party on appeal.  (**See** Appellant's Brief at 5).  To the extent the caption also references "Wilkes-Barre General Hospital Emergency Department," the trial court noted that this entity "is neither a person nor a legal entity…."  (Trial Court Opinion, filed 6/21/21, at 6; R.R. at 1120a).  Consequently, WBGH's *praecipe* for the entry of judgment requested the entry of judgment in its favor only, making no mention of the "Wilkes-Barre General Hospital Emergency Department."  (**See** *Praecipe* for Entry of Judgment, filed 3/24/21, at 1; R.R. at 1106a).

vicarious liability. (**See** Complaint, filed 11/25/15, at ¶140; R.R. at 27a).

On July 22, 2016, WBGH filed a joinder complaint against PPS. The joinder complaint stated that WBGH executed a contract for PPS to provide "the physicians, physician assistants and nurse practitioners" to staff WBGH's emergency department. (Joinder Complaint, filed 7/22/16 at ¶9; R.R. at 57a). Thus, WBGH asserted its "right to indemnification and/or contribution against [PPS] … for the amount of any judgment entered in favor of [Appellant]." (**Id.** at ¶22; R.R. at 61a).

The trial court opinion set forth the remaining procedural history of this appeal as follows:

> A jury trial was conducted beginning on October [2], 2020. On October 7, 2020, after the testimony of all of [Appellant's] liability witnesses, including her only medical liability expert, Ronald A. Paynter, M.D. (hereinafter Dr. Paynter), PPS moved for a compulsory nonsuit on all claims against it and WBGH moved for a compulsory nonsuit with respect to [Appellant's] claim based on corporate negligence. [Appellant] did not oppose PPS's motion, however, WBGH did. [Appellant] did oppose WBGH's motion, however, PPS did not. Ultimately, the court denied PPS's motion for a compulsory nonsuit but granted WBGH's. As a result, [Appellant's] only claims remaining against WBGH were those based on vicarious liability. WBGH's claim against PPS seeking indemnification and/or contribution also remained.
>
> Trial resumed and, on October 15, 2020, following the court's instructions to the jury regarding the applicable law involved in the case and the closing arguments of counsel for the parties, the court … presented a verdict slip to the jury in which "Question No. 1" appeared as follows:
>
> **Question No. 1**

- 3 -

Do you find that the conduct of anyone listed below fell below the standard of care. In other words, was anyone listed below negligent?

Laura Bond, RN[2]        ___ Yes        ___ No

[PPS]                    ___ Yes        ___ No

**If you answer Question No. 1 "No" as to everyone, you have reached a verdict. The foreperson should sign the verdict slip and notify the tipstaff.**

**If you answer Question No. 1 "Yes" as to anyone, go to Question No. 2.**

The court specifically instructed the jury regarding "Question No. 1" as well [as] the other five jury verdict interrogatories that were included on the verdict slip. At the conclusion of the court's final instructions, the jury was left by themselves in the courtroom to deliberate (rather than retire to a separate room because of COVID restrictions in place at the time).

After approximately fourteen minutes of deliberation, the jury informed the court's tipstaff that they had reached a verdict. The parties who were present, counsel, and the undersigned returned to the courtroom. At no time prior to the jury announcing their verdict did counsel for any party raise an objection with respect to the length of time that the jury had deliberated. After the court reviewed the verdict slip and found it to be in order, the jury foreperson announced that the jury had answered "No" on "Question No. 1" as to both Laura Bond, RN and [PPS]. The request of [Appellant's] counsel to poll the jury was granted and it indicated that ten of the twelve jurors were in agreement with [the] verdict. The court directed that the verdict be entered of record and the jurors were dismissed.

_____

[2] As we will discuss in conjunction with Appellant's first issue, Nurse Bond, a WBGH employee, was the nurse who cared for Decedent following his admission to WBGH's emergency department. (**See** Trial Court Opinion at 5; R.R. at 1119a).

- 4 -

> On October 26, 2020, [Appellant] filed a motion for post-trial relief pursuant to Pa.R.C.P. No. 227.1 in which she requested a removal of the nonsuit with the respect to her corporate negligence claim, a "new trial on all issues of liability and damages" and the "scheduling of an evidentiary hearing with respect to issues of potential jury misconduct." Both WBGH and PPS filed responses to the motion. All parties filed briefs, and oral argument on the motion was held before the court on December 23, 2020. Prior to the court ruling on the motion …, WBGH, on March 24, 2021, entered judgment on the verdict pursuant to Pa.R.C.P. No. 227.4(1)(b).[3]

(Trial Court Opinion at 2-4; R.R. at 1116a-1118a) (some capitalization omitted).

Appellant timely filed a notice of appeal on April 22, 2021. The trial court did not order Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On January 20, 2023, a three-judge panel of this Court vacated the judgment in favor of WBGH and remanded the case for a new trial. WBGH timely filed an application for reargument on February 1, 2023. On March 31, 2023, this Court granted *en banc* review and withdrew the prior panel's decision.

Appellant now raises three issues for this Court's review:

---

[3] "Once a post-trial motion is timely filed, judgment cannot be entered until the trial court enters an order disposing of the motion or the motion is denied by operation of law one hundred and twenty days after the filing of the motion." ***Melani v. Northwest Engineering, Inc.***, 909 A.2d 404, 405 (Pa.Super. 2006) (citing Pa.R.C.P. 227.4). Here, the trial court had yet to rule on Appellant's post-trial motion prior to WBGH filing its *praecipe* for entry of judgment. Nevertheless, at the time when WBGH filed its *praecipe*, more than 120 days had passed since the filing of the post-trial motion.

Did [Appellant] present evidence of corporate liability sufficient to have required the trial court to deny a nonsuit motion by [WBGH] and submit this claim to the jury?

Did [Appellant] present evidence of [WBGH's] vicarious liability for the acts and omissions of attending physician, Dr. Perry, and its staff in general, sufficient to submit this claim to the jury as against the hospital itself on question 1 of the verdict slip?

Given the overall record of trial proceedings, should an evidentiary hearing have been conducted by the trial court to determine whether juror misconduct influenced the verdict?

(Appellant's Brief at 4).

In her first issue, Appellant insists that hospital personnel must "recognize and report abnormalities in the treatment and condition of [their] patients." (*Id.* at 35). Appellant relies on the testimony from her liability expert, Dr. Paynter, to establish that hospital personnel recognized Decedent's deteriorating condition, but they failed to take appropriate actions under the circumstances. Appellant acknowledges WBGH's argument that the record is "devoid of evidence of [WBGH's] actual or constructive knowledge of the defects or procedures that caused harm" to Decedent. (*Id.* at 34). Appellant emphasizes, however, that emergency department personnel knew that Decedent was tachycardic, with falling blood pressure, and elevated respirations. Appellant claims these symptoms were "reported on monitors located in the patient's room and at the central nurses' station," and these monitors provided "actual, continuing notice" of Decedent's deteriorating condition. (*Id.* at 36) (emphasis omitted). Moreover, Appellant asserts that

"constructive notice must be imposed when the failure to act to receive actual notice is caused by the absence of supervision." (**Id.** at 44) (quoting **Brodowski v. Ryave**, 885 A.2d 1045, 1057 (Pa.Super. 2005), *appeal denied*, 587 Pa. 680, 897 A.2d 449 (2006)). In light of the relevant case law, Appellant argues that Dr. Paynter's testimony established a deviation from the applicable standard of care. Appellant concludes that the trial court should have submitted her corporate negligence claim to the jury, and the court committed reversible error by granting WBGH's motion for nonsuit. We disagree.

The relevant standard of review is as follows:

> In reviewing the entry of a nonsuit, our standard of review is well-established: we reverse only if, after giving appellant the benefit of all reasonable inferences of fact, we find that the factfinder could not reasonably conclude that the essential elements of the cause of action were established. Indeed, when a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture.
>
> *   *   *
>
> On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor. The compulsory nonsuit is otherwise properly removed and the matter remanded for a new trial. … The appellate court must review the evidence to determine whether the trial court abused its discretion or made an error of law.

**Munoz v. Children's Hospital of Philadelphia**, 265 A.3d 801, 805-06

(Pa.Super. 2021), *appeal denied*, ___ Pa. ___, 283 A.3d 1246 (2022) (internal citations and quotation marks omitted).

In ***Thompson v. Nason Hosp.***, 527 Pa. 330, 591 A.2d 703 (1991), our Supreme Court "first adopted the theory that a corporation, specifically a hospital, can be held directly liable for negligence." ***Welsh v. Bulger***, 548 Pa. 504, 512, 698 A.2d 581, 585 (1997). "Corporate negligence is a doctrine under which a hospital owes a direct duty to its patients to ensure their safety and well-being while in the hospital." ***Ruff v. York Hospital***, 257 A.3d 43, 49 (Pa.Super. 2021), *appeal denied*, ___ Pa. ___, 266 A.3d 1064 (2021).

Under ***Thompson***, a hospital has the following duties:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

> Because the duty to uphold the proper standard of care runs directly from the hospital to the patient, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action in corporate negligence. Instead, corporate negligence is based on the negligent acts of the institution. A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees. Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts.

***Welsh, supra*** at 512-13, 698 A.2d at 585 (internal citations and quotation marks omitted).

With the four duties and the nature of a corporate negligence claim in mind, we now examine the three elements necessary to establish a *prima facie* case of corporate negligence. The plaintiff must establish all of the following:

> 1. [the hospital] acted in deviation from the standard of care;
>
> 2. [the hospital] had actual or constructive notice of the defects or procedures which created the harm; and
>
> 3. that the conduct was a substantial factor in bringing about the harm.

**Brodowski, supra** at 1057 (internal citation omitted). "[U]nless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff." **Welsh, supra** at 514, 698 A.2d at 585.

"To establish a claim for corporate negligence against a hospital, a plaintiff must show that the hospital had actual or constructive knowledge of the defect or procedures that created the harm." **Ruff, supra** at 50 (quoting **Welsh, supra** at 513, 698 A.2d at 585).

> It is well settled that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients. If the attending physician fails to act in accordance with standard medical practice, it is incumbent upon the hospital staff to so advise hospital authorities in order that appropriate action might be taken. A hospital is properly charged with constructive notice when it "should have known" of the patient's condition. Furthermore, constructive

notice must be imposed when the failure to receive actual notice is caused by the absence of supervision. We interpret "failure to enforce adequate rules and policies" as an analog to "failure to provide adequate supervision."

[***Rauch v. Mike-Mayer***, 783 A.2d 815, 828 (Pa.Super. 2001), *appeal denied*, 568 Pa. 634, 793 A.2d 909 (2002)] (citations omitted). For example, a hospital will be charged with constructive notice when its nurses should have known about a patient's adverse condition, but failed to act. ***See, e.g., Whittington v. Episcopal Hosp.***, 768 A.2d 1144, 1154 (Pa.Super.2001). In such cases, we have said that "constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision." ***Id.***

***Brodowski, supra*** at 1057. "In a corporate negligence action against a hospital, the element of actual or constructive notice is critical because the corporate negligence doctrine contemplates a kind of systemic negligence in the actions and procedures of the hospital itself rather than in the individual acts of its employees." ***Ruff, supra*** at 50 (internal citation and quotation marks omitted).

This Court has elaborated on these concepts as follows:

[A] hospital is not directly liable under ***Thompson*** just because one of its employees or agents makes a mistake which constitutes malpractice. Just as regular negligence is measured by a reasonable person standard, a hospital's corporate negligence will be measured against what a reasonable hospital under similar circumstances should have done. ***Thompson*** contemplates a kind of systemic negligence, such as where a hospital knows that one of its staff physicians is incompetent but lets that physician practice medicine anyway; or where a hospital should realize that its patients are routinely getting infected because the nursing staff is leaving catheters in the same spot for too long, yet the hospital fails to formulate, adopt

- 10 -

> or enforce any rule about moving catheters. ***Thompson*** does not propound a theory of strict liability…. Though broadly defined, ***Thompson*** liability is still fault based.

***Edwards v. Brandywine Hosp.***, 652 A.2d 1382, 1386-87 (Pa.Super. 1995).

Instantly, Appellant relies on Dr. Paynter's testimony to establish WBGH's knowledge of the defects and procedures that resulted in harm to Decedent. (***See*** Appellant's Brief at 25-31). At trial, Dr. Paynter testified as an expert "in the medical fields of emergency medicine and corporate responsibility." (N.T. Trial Part 2 at 34; R.R. at 165a). At the start of his direct examination, Dr. Paynter opined that WBGH's emergency department "did not meet the standard of care." (***Id.*** at 35; R.R. at 166a). Dr. Paynter explained that the paramedics who responded to the 911 call discovered that Decedent "was very short of breath," and they gave Decedent "breathing treatments and then they put him on a CPAP machine." (***Id.*** at 36, 37, R.R. at 167a, 168a). According to Dr. Paynter, these circumstances should have prompted the emergency department to test Decedent's arterial blood gas:

> Anybody who arrives in a hospital with either CPAP or BiPAP right off the ambulance is required to have a test called an arterial blood gas. Now, what is an arterial blood gas? … It's taken from usually the radial artery in your wrist and it goes into your pulsing artery … and it takes blood that has just gone through your lungs and heart into the artery and it's a much better measure. It's the only real standard measure for the person's respiratory status….

(***Id.*** at 38; R.R. at 169a).

Dr. Paynter posited that the arterial blood gas test "is a guide to how to manage this person's respiratory condition." (***Id.*** at 39; R.R. at 170a). If the

test reveals that a patient is in so much respiratory distress that they might stop breathing, then "you want to intubate the patient before they have respiratory arrest." (**Id.**) Dr. Paynter criticized the emergency department for not following these protocols with Decedent:

> They didn't do any of that. They just placed [Decedent] in a room and he got progressively worse to the point where he reached the point of *in extremis*, is the term we use in medicine, and that's the time before you die. And he ripped his mask off and he stopped breathing and his blood pressure, his pulse all stopped.

(**Id.** at 40-41; R.R. at 171a-172a).

Dr. Paynter reviewed Decedent's autopsy report, which "indicated the factual cause of death was lack of oxygen to the brain." (**Id.** at 46; R.R. at 177a). Appellant's counsel questioned whether Decedent's brain would have had sufficient oxygen if WBGH's emergency department had placed him on a ventilator. Dr. Paynter responded:

> Well in order to answer that question I need to bring up this period of time in which [Decedent] was unobserved for 12 minutes before he coded.
>
> He was getting oxygenated, but he was becoming more acidotic[4] to the point that he lost consciousness and stopped breathing and it was unnoticed apparently for a period of time. That's a serious situation. It only takes six minutes for the brain not receiving oxygen to die. And anything over that time can lead to permanent brain damage.

---

[4] Earlier, Dr. Paynter asserted: "If you're not breathing adequately, your blood becomes acid, acidotic is the term we use." (N.T. Trial Part 2 at 38; R.R. at 169a).

- 12 -

(*Id.* at 46-47; R.R. at 177a-178a). Ultimately, Dr. Paynter testified: "If [Decedent] had been intubated prior to that [twelve-minute period], he would have been protected." (*Id.* at 47; R.R. at 178a).

Thereafter, Appellant's counsel shifted his focus to the medical monitoring equipment in the emergency department. Counsel asked whether Decedent "was hooked up to certain monitors" that have alarms. (*Id.*) Dr. Paynter responded:

> Absolutely. Let me explain a little bit about them. You put a high/low on the heart rate. You put a high/low alarm on the respiratory rate. So if the respiratory rate goes down say below 10, it would beep, beep, beep and then somebody would run in and see within seconds. There was testimony that there were no alarms on.

(*Id.*) Later, Appellant's counsel revisited the issue of the alarms:

> [COUNSEL]: Did you hear Ms. Bond testify that she did not hear any alarms come from the monitoring equipment that was attached to [Decedent]?
>
> [DR. PAYNTER]: I did; yes.
>
> &ast; &ast; &ast;
>
> [COUNSEL]: Whose responsibility is it to have working equipment in the hospital?
>
> [DR. PAYNTER]: It's the hospital's responsibility.

(*Id.* at 53; R.R. at 184a).

Significantly, this exchange regarding the alarms on the monitoring equipment was based on a mischaracterization of Nurse Bond's testimony. Nurse Bond did **not** testify that the alarms were off or that they somehow

- 13 -

malfunctioned. Rather, Nurse Bond did not remember hearing the alarms:

> [COUNSEL]: Thank you. When you returned to the room to find [Decedent] in arrest there were no alarms sounding were there?
>
> [NURSE BOND]: To my knowledge I cannot recall. That was in 2013.
>
> [COUNSEL]: Ma'am, you seem to recall today a great deal about 2013. You just told the jury you remember that. Do you have any specific recollection of alarms sounding when you went back to the room in 2013 at 5:54?
>
> [NURSE BOND]: I'm telling you I do not recall. I have been doing this for a long time. I hear them all the time. I cannot on oath tell you, yes, I specifically recall.

(N.T. Trial Part 1 at 337-38; R.R. at 116a).

Further, Nurse Bond explained the circumstances that led her to step away from Decedent's bedside for the twelve-minute period referenced by Dr. Paynter:

> The only time that I had to run was to grab meds quickly. He got multiple antibiotics and steroids. And then I had explained his systolic blood pressure had dropped into the 70s and we were giving him antibiotics and such and I felt it was a need that needed to be addressed by Dr. Perry because this man was sick. I went out and spoke to Dr. Perry about it because we have been working together so long and I said what's our next plan of action for this man.

(*Id.* at 310-11; R.R. at 88a). Nurse Bond emphasized that she needed to notify Dr. Perry of the drop in blood pressure "[b]ecause he's the team lead. He's the doctor who I report to." (*Id.* at 314; R.R. 91a-92a).

Nurse Bond also testified that she did not believe she was endangering Decedent by leaving his bedside:

I was giving him IV fluids, medications.  I inserted an IV and drew labs off of it.  I was taking vital signs and there is clear documentation that [Decedent] was on his cell phone and … I said a silly comment to him about that and he was completely awake, alert, and oriented.  And I had no reason to feel leaving him to get IV fluids or speak to Dr. Perry would be any danger to the patient.

(***Id.*** at 321; R.R. at 99a).

The court analyzed this testimony and determined that the entry of a nonsuit on Appellant's corporate negligence claim was warranted:

During his testimony, Dr. Paynter was specifically critical of Nurse Bond and the "Wilkes-Barre General Hospital Emergency Department" but mentioned no other individual, including [Dr. Perry], who was the attending emergency room physician when [Decedent] arrived at WBGH on August 9, 2013.  Much of Dr. Paynter's testimony was given in generalized, non-specific terms of what he believed "they" should have done differently without identifying who "they" were.  Since the "Wilkes-Barre General Hospital Emergency Department" is neither a person nor a legal entity and this was not a case of *res ipsa loquitur*, the only fair inference regarding who "they" were in the context of [the] testimony was Nurse Bond and Dr. Perry.  In his own words, Dr. Paynter's criticism of their care was essentially limited to two issues: "One, they didn't get ahead of it [Decedent's worsening condition] by doing the [arterial] blood gas and doing an elective intubation.  And two, when he did finally peter out and stopped breathing on his own, they were not there to help him."

\* \* \*

Even assuming, *arguendo*, that the jury had concluded that Nurse Bond and/or Dr. Perry were negligent (which they obviously did not given their answer to "Question No. 1" on the verdict slip), [Appellant] provided no evidence to establish that WBGH as an institution had actual or constructive notice of such negligence during the approximately twelve hours that [Decedent] was treated there. … Finally, while Dr. Paynter did speculate that there

- 15 -

> may have been some issues regarding the alarms on some of the monitoring equipment in the emergency room, his testimony fell well short of what would be required to make out a case under the first prong of ***Thompson***.

(Trial Court Opinion at 5-7; R.R. at 1119a-1121a) (some capitalization omitted).

Here, the court correctly entered a nonsuit on Appellant's corporate negligence claim. This case did not involve "a kind of systemic negligence" on the part of WBGH. ***See Ruff, supra***; ***Edwards, supra***. The trial evidence centered on the individual decisions and actions of a doctor and nurse in conjunction with their care of a critically ill patient. Our review of the record reveals that Appellant did not provide any expert testimony that Nurse Bond's medical care of the patient fell below acceptable medical standards to warrant the imposition of constructive notice onto WBGH. ***See Brodowski, supra***. Nurse Bond was providing the medical care that the doctor had ordered for Decedent, and this care led her to observe that Decedent's systolic blood pressure had dropped. Rather than sitting back and watching Decedent deteriorate, Nurse Bond proactively sought advice from the attending physician on the next steps for treatment. ***Compare Welsh, supra*** (holding plaintiff established *prima facie* case of corporate negligence against hospital based on its failure to oversee all persons practicing medicine within its walls; expert testified that hospital nurses breached applicable standard of care in connection with delivery of infant, in that they must have been aware of problem with delivery but failed to act on that knowledge). Likewise, when

viewed in the context of Nurse Bond's testimony about the night at issue, and her testimony that she did not remember if any alarms went off, the court properly determined that Dr. Paynter's statements about the purported failures of the alarms on the monitoring equipment amounted to speculation. Based upon the foregoing, the court did not abuse its discretion or make an error of law by entering the nonsuit on Appellant's corporate negligence claim. **See Munoz, supra**. Accordingly, Appellant is not entitled to relief on her first claim.

In her second issue, Appellant asserts that she "made a deliberate decision in 2015 to bring suit against the hospital **and not to** file claims against Dr. Perry, Nurse Bond or any other individual hospital employee." (Appellant's Brief at 45-46) (emphasis in original). As such, Appellant contends that the "trial court's decision to substitute PPS and Laura Bond on the verdict slip, in place of [WBGH], was inconsistent with the pleadings, [Appellant's] theory of the case and the evidence presented at trial." (**Id.** at 45). To the extent the verdict slip asked the jury to determine whether the conduct of Nurse Bond or PPS violated the standard of care, Appellant maintains that she did not "offer a theory of liability, an expert report or expert opinion testimony contending that either Nurse Bond or … PPS violated a specific standard of care[.]" (**Id.** at 46). Instead, Appellant's "standard of care evidence was directed at the hospital." (**Id.**)

Further, Appellant argues that her complaint included "general negligence allegations against WBGH separate from its corporate negligence theory of liability." (*Id.*) Appellant insists that she proved WBGH's negligence by presenting "sufficient evidence of the vicarious liability of [WBGH] for the acts and omissions of Dr. Perry[.]" (*Id.* at 48). Appellant concludes that "it was the hospital and not PPS that should have been named on the verdict slip." (*Id.*)

As a prefatory matter, on October 11, 2021, PPS filed an application to dismiss this issue, pursuant to Pa.R.A.P. 1972(a)(5).[5] PPS argued that Appellant "failed to object to placing PPS on the verdict slip during trial," and Appellant could not salvage this claim by raising it for the first time at the post-trial stage. (Application to Dismiss, filed 10/11/21, at ¶15). By order entered October 25, 2021, this Court deferred PPS's application to the merits panel. We also provided time for Appellant to respond to PPS's application. Appellant timely filed her response on November 2, 2021. In it, Appellant argued that she preserved this claim during the court's charging conference on October 15, 2020. We now consider the parties' various arguments regarding this issue of waiver.

"Issues not raised in the trial court are waived and cannot be raised for

_____

[5] Generally, a party may move "[t]o dismiss for failure to preserve the question below, or because the right to an appeal has been otherwise waived." Pa.R.A.P. 1972(a)(5).

- 18 -

the first time on appeal." Pa.R.A.P. 302(a). "A party 'may not, at the post-trial motion stage, raise a new theory which was not raised during trial.'" **E.S. Management v. Yingkai Gao**, 176 A.3d 859, 864 (Pa.Super. 2017) (quoting **Keffer v. Bob Nolan's Auto Service, Inc.**, 59 A.3d 621, 630 (Pa.Super. 2012)).

> On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction … one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

**McManamon v. Washko**, 906 A.2d 1259, 1274 (Pa.Super. 2006), *appeal denied*, 591 Pa. 736, 921 A.2d 497 (2007) (quoting **Hong v. Pelagatti**, 765 A.2d 1117, 1123 (Pa.Super. 2000)). More specifically, an appellant's failure to object to the verdict slip at trial waives a subsequent challenge to the verdict slip on appeal. **See Kimble v. Laser Spine Institute, LLC**, 264 A.3d 782, 794 (Pa.Super. 2021) (*en banc*), *appeal denied*, ___ Pa. ___, 274 A.3d 722 (2022).

Instantly, the court conducted a charging conference on October 15, 2020. At that time, the parties extensively discussed how the court should instruct the jury regarding the legal relationships between WBGH and Dr. Perry and Nurse Bond. Initially, counsel for PPS stated, "I think the only relevant inquiry is whether the physician provided by [PPS], Dr. Perry, was an ostensible agent of [WBGH]." (N.T. Trial Part 2 at 848; R.R. at 1050a).

Ultimately, PPS's counsel agreed to a stipulation "to the effect that it is undisputed that Dr. Adam Perry was the emergency room physician provided to [WBGH] during the relevant time period." (*Id.* at 850; R.R. at 1052a).

Thereafter, the parties continued to address the use of the term "ostensible agent" during their review of the defendant's proposed verdict slip. The court asked Appellant's counsel:

> [W]ell, let's talk about question four on the defendant's [proposed verdict slip]. Do you find that the emergency room physician supplied to the emergency department by [PPS] was an ostensible agent of [WBGH]. Now, … is [Appellant] okay with that?

(*Id.* at 858; R.R. at 1060a). Appellant's counsel replied, "I believe that in order for them to answer [questions] one and two, they will have already considered the court's instructions and it is unnecessary." (*Id.*) Appellant's counsel expressed his preference for the term "apparent agent," as opposed to "ostensible agent." (*Id.* at 859, 861; R.R. at 1061a, 1063a). The court agreed to use the term "apparent." (*Id.* at 862; R.R. at 1064a). At that point, Appellant's counsel immediately shifted the focus of the discussion from PPS and Dr. Perry to the proposed verdict slip's "substitution of Laura Bond for [WBGH]." (*See id.* at 862-65; R.R. at 1064a-1067a).

We detail these discussions because Appellant now relies upon this portion of the transcript to support her claim that she raised a timely objection to PPS's placement on the verdict slip. (*See* Appellant's Response to Application to Dismiss, filed 11/2/21, at ¶7). We cannot agree, however, that

counsel's questioning of the terminology in the defendant's proposed verdict slip equates to the issue Appellant now raises on appeal, which is a specific objection to the substitution of PPS for WBGH.  Moreover, the court gave the parties one more opportunity to object to the verdict slip, immediately before it provided the verdict slip to the jurors:

> THE COURT:                    I want to confirm that the court has furnished all counsel with a copy of the revised verdict slip, and except for objections, which were previously memorialized on the record, such as [the] defendant's objection to the lack of comparative negligence, are counsel now satisfied with the verdict slip?
>
> [APPELLANT'S COUNSEL]:        Yes.

(N.T. Trial Part 2 at 955-56).[6]

Based upon our review of the record, we agree with PPS that Appellant failed to make a timely and specific objection to the naming of PPS on the verdict slip.  **See Kimble, supra**; **E.S. Management, supra**; **McManamon, supra**.  Consequently, Appellant's second issue is waived, and we grant PPS's application for relief.

In her third issue, Appellant complains that "the jury returned a verdict within 14 minutes after the case was given to it for decision."  (Appellant's Brief at 49).  Appellant "does not believe that the 'conference' resulting in a verdict should be considered 'deliberations' within the meaning of our civil justice system."  (**Id.**)  "[G]iven the complex nature of the case, the extensive

---

[6] This portion of the transcript was omitted from the reproduced record.

proofs and the unusually brief period of time in which the verdict was secured," Appellant concludes that this Court must remand the matter for "an evidentiary hearing to examine whether an improper outside influence, or other misconduct, influenced the jury's final hour of service to the [c]ourt." (*Id.* at 51). We disagree.

"[I]n instances of post-verdict allegations of extraneous information and/or outside influence affecting jury deliberations, we adopt the objective test for prejudice as well as the associated guidelines that are set forth in the lead opinion in [*Carter by Carter v. U.S. Steel Corp.*, 529 Pa. 409, 421-22, 604 A.2d 1010, 1016-17 (1992), *cert. denied*, 506 U.S. 864, 113 S.Ct. 186, 121 L.Ed.2d 130 (1992)]."[7] *Pratt v. St. Christopher's Hosp.*, 581 Pa. 524, 541, 866 A.2d 313, 324 (2005). "The procedure for development of such claims and their ultimate disposition remain vested, in the first instance, within the sound discretion of the trial courts." *Id.* In post-trial proceedings alleging

---

[7] In *Carter*, a plurality opinion, Justice Larsen wrote the opinion announcing the judgment of the Court. Significantly, *Carter* provided a framework for determining whether an outside influence on a jury created "a reasonable likelihood of prejudice" warranting a new trial:

> In determining the reasonable likelihood of prejudice, the trial judge should consider 1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; 2) whether the extraneous influence provided the jury with information they did not have before them at trial; and 3) whether the extraneous influence was emotional or inflammatory in nature.

*Carter, supra* at 421-22, 604 A.2d at 1016-17 (footnote omitted).

that a jury was influenced by extraneous information or outside influence, the burden of proof is allocated to the party contesting the verdict. ***See id.*** at 541, 866 A.2d at 323.

Instantly, the court recognized that the only basis for Appellant's "outside influence" claim was the amount of time spent in deliberations:

> In the present case, unlike those relied upon in [Appellant's post-trial] brief, there has been no indication to the court or counsel, by a juror or anyone else, that extraneous prejudicial information was brought to the jury's attention or that an outside influence was improperly brought to bear on any juror. Instead, [Appellant] urges this court to take "judicial notice" that the length of the jury's deliberations, standing alone, is *per se* evidence of jury misconduct and requests an evidentiary hearing in which all sixteen jurors (12 members and 4 alternates) can be questioned regarding the nature of their deliberations.

(Trial Court Opinion at 10; R.R. at 1124a) (some capitalization omitted).

Although Appellant correctly cites Pa.R.E. 606(b) for the proposition that a juror may testify about whether prejudicial information or outside influence was improperly brought to bear on the jury, the trial court correctly determined that Appellant failed to offer any good reason to justify further inquiry into the validity of the verdict. Appellant does not cite any relevant authority to establish that quick deliberations are evidence of outside influence. Absent more, we agree with WBGH's assertion that Appellant's request constitutes "a wholesale fishing expedition by her counsel in the face of a defense verdict." (***See*** WBGH's Brief at 41). ***See also Pratt, supra*** at 543, 866 A.2d at 324-25 (Justice Newman dissenting) (explaining that general

rule that jurors may not impeach verdict was formulated to, *inter alia*, discourage harassment of jurors by losing parties). On this record, the court did not err in finding that Appellant failed to satisfy her burden and cannot demonstrate the need for further evidentiary proceedings. **See Pratt, supra**. Accordingly, we affirm the judgment entered in favor of WBGH.

Judgment affirmed. Application to dismiss Appellant's second issue is granted.

Judge Bowes, Judge Olson, Judge Dubow, Judge Murray joined this Opinion.

Judge Olson files a Concurring Opinion in which Judge Bowes and Judge Dubow joined.

Judge Kunselman files a Dissenting Opinion in which President Judge Panella, Judge McLaughlin and Judge McCaffery joined.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/11/2023