2023 PA Super 262

| | | |
|---|---|---|
| LESLEY COREY, AS ADMINISTRATRIX OF THE ESTATE OF JOSEPH COREY, AND LESLEY COREY, IN HER OWN RIGHT | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : | |
| v. | : : | |
| WILKES-BARRE HOSPITAL COMPANY, LLC, D/B/A WILKES-BARRE GENERAL HOSPITAL, WILKES-BARRE GENERAL HOSPITAL EMERGENCY DEPARTMENT AND J. CHARLES LENTINI, M.D. | : : : : : : : | |
| v. | : : | |
| PENNSYLVANIA PHYSICIANS SERVICES, LLC | : : : | |
| Additional Defendant | : | No. 507 MDA 2021 |

Appeal from the Judgment Entered March 24, 2021
In the Court of Common Pleas of Luzerne County Civil Division at No(s): 2015-07551

BEFORE:  PANELLA, P.J., BOWES, J., OLSON, J., DUBOW, J., KUNSELMAN, J., MURRAY, J., McLAUGHLIN, J., KING, J., and McCAFFERY, J.

DISSENTING OPINION BY KUNSELMAN, J.: **FILED: DECEMBER 11, 2023**

I believe the trial court should have submitted Mrs. Corey's corporate-negligence claim against Wilkes Barre General Hospital to the jury. Its failure to do so was reversible error. Thus, I respectfully dissent.

This Commonwealth has allowed claims of corporate negligence against hospitals for over 30 years. In **Thompson v. Nason Hosp.**, 591 A.2d 703 (Pa. 1991), the Supreme Court of Pennsylvania recognized four specific duties

of care that a hospital owes to its patients, independent of the duties owed by the doctors and staff. Those duties are:

(1) To use reasonable care in the maintenance of safe and adequate facilities and equipment;

(2) To select and retain only competent physicians;

(3) To oversee all persons who practice medicine within its walls as to patient care; and

(4) To formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*See id.* at 707 (citing *Chandler Gen. Hosp. Inc. v. Purvis*, 181 S.E.2d 77 (Ga. App. 1971); *Johnson v. Misericordia Community Hosp.*, 301 N.W.2d 156 (Wis. 1981); *Darling v. Charleston Community Hosp.*, 211 N.E.2d 253 (Ill. 1965); and *Wood v. Samaritan Institution*, 161 P.2d 556 (Cal. Ct. App. 1945)).

"A cause of action for corporate negligence arises from the policies, actions or *inactions* of the institution itself rather than the specific acts of individual hospital employees." *Welsh v. Burger*, 698 A.2d 581, 585 (Pa. Super. 1997) (emphasis added). Analysis of corporate negligence should begin by identifying which of the above duties the hospital allegedly breached.

In her Complaint, Mrs. Corey alleged the hospital breached the third and fourth duties from *Thompson*. *See* Complaint at ¶ 109. She claims the hospital itself failed to oversee her husband's care and to ensure that he was appropriately evaluated and treated in the emergency department. In her

brief, she argues the hospital failed to oversee her husband's care, because it did not ensure its staff performed certain tests and treatments, which any reasonable hospital would have ensured.[1] Corey's Brief at 32-45. The ***Thompson*** case involved similar allegations and illustrates a hospital's duties under this third duty.

There, the Thompsons claimed Nason Hospital breached the third duty of care, because it failed to monitor the quality of Mrs. Thompson's care in its emergency room. Following a car accident, she arrived at the Hospital in an ambulance with head and leg injuries. Her husband advised the staff that she was taking anticoagulants and that she had a pacemaker. The next day, Mrs. Thompson was unable to move her left foot and toes. Two days later, she was completely paralyzed on her left side and never regained motor function.

The Thompsons sued the hospital for corporate negligence because it negligently failed to monitor her condition. The hospital asserted that it had no duty to observe, to supervise, or to control the "independent-contractor" doctors and nurses[2] who treated Mrs. Thompson. Finding no duty, the trial court dismissed the corporate-negligence claim. This Court and the Supreme Court of Pennsylvania disagreed and reversed. Both appellate courts held that

---

[1] Although the Complaint listed breach of the third and fourth duties found in ***Thompson v. Nason Hosp.***, 591 A.2d 703 (Pa. 1991), Mrs. Corey's brief fails to identify which theories she is pursuing on appeal. However, the arguments and cases she cites all relate to the third duty. Accordingly, I limit my analysis to the third duty of corporate negligence.

[2] Whether the hospital misclassified its staff as independent contractors under THE RESTATEMENT SECOND OF AGENCY was not at issue in the appeal.

corporate-negligence claims are compatible with Pennsylvania tort law and that a question of material fact existed as to whether the hospital negligently supervised the independent contractors who treated Mrs. Thompson.

Similarly, in **Whittington v. Episcopal Hospital**, 768 A.2d 1144 (Pa. Super. 2001), this Court further elaborated on the third theory of hospital liability.  There, we explained what a plaintiff who proceeds under this theory must establish to allow a claim of corporate negligence to go to the jury.  A detailed summary of that case is essential to my analysis.

In **Whittington**, the administratrix of the estate of Claudette Milton filed a wrongful death and survivor action against Episcopal Hospital and others, after Ms. Milton died following complications while giving birth.  **Id.** at 1147. Very late in her pregnancy, Ms. Milton went to see her treating obstetrician, who sent her to Episcopal Hospital for tests.  Despite having high blood pressure, leg pain, and other symptoms of pregnancy induced hypertension ("PIH"), indicating the need to have labor induction initiated immediately, the hospital sent her home with only a prescription for an iron supplement.

A week later, Ms. Milton again visited her obstetrician, who again ordered tests at Episcopal Hospital, after which Ms. Milton was to be released. That same day, the hospital's nurses and physicians performed the ordered tests. Notwithstanding Ms. Milton's clearly elevated blood pressure and test results, which again should have mandated immediate labor induction, the hospital's staff neither admitted her, nor even questioned her obstetrician's

instructions that she should go home and wait until the following day for labor induction.

The following day, Ms. Milton was admitted to the hospital for induced labor at 7:30 a.m. Instead of being admitted to the labor and delivery room promptly upon arrival, she was kept in a waiting room for nearly 14 hours, until 9:00 p.m. She had a family history of PIH and was complaining of a headache, but the hospital ordered no lab work. She should have been evaluated every three to four hours, but essentially was ignored for the entire day. At 9:00 p.m., with elevated blood pressure, she was transferred to labor and delivery for induction. She showed consistently high blood pressure but drugs to correct this condition were not ordered until approximately 7:00 a.m. the next morning. She did not receive the drugs until 8:40 a.m., by which point her condition had greatly deteriorated.

A few hours later, Ms. Milton was rushed to an emergency C-section, but the procedure was delayed, and the hospital performed it under clearly unfavorable conditions. After delivery, the doctors and nurses did not order the necessary deep vein thrombosis ("DVT") prophylaxis. This resulted in blood clots in Ms. Milton's lungs and pulmonary edema (a complication of severe preeclampsia), accompanied by the lungs filling with fluid. Ms. Milton regained consciousness briefly, but she soon needed a ventilator. The hospital transferred her to intensive care, but the doctors again failed to order appropriate measures to save her. Ms. Milton developed Adult Respiratory Distress Syndrome and died. She was 26 years old.

The administratrix of Ms. Milton's estate sued numerous persons and alleged corporate negligence against the hospital. Prior to trial, all defendants settled except the hospital. At trial, the court admitted evidence relating to Ms. Milton's entire course of care, so the jury could apportion liability among the hospital and other defendants. The jury found the hospital 15% directly liable for its corporate negligence and 10% vicariously liable; it awarded $2,200,000 in damages.

The hospital moved for judgment notwithstanding the verdict ("JNOV"). It argued the estate failed to make a *prima facie* case for corporate negligence. The trial court denied the motion, and the hospital appealed.

To establish corporate negligence under this theory, this Court explained that plaintiffs must introduce evidence of the following:

1. ***The hospital acted in deviation of the standard of care;***

2. ***The hospital had actual or constructive notice of the defects of procedures which caused the harm; and***

3. ***The conduct was a substantial factor in bringing about the harm.***

*Id.* at 1149 (citing **Welsh**, 698 A.2d at 585) (emphasis added). Further, unless the hospital's negligence was obvious, we held expert testimony was required to establish the first and third prongs of the above test. *Id.*

We then concluded that the estate of Ms. Milton met each of these three prongs. First, the estate's expert opined that the hospital deviated from the

standard of care at the time Ms. Milton was admitted, because the appropriate course of action was not taken:

> At the time she was admitted on 12/22/93, she was again with fulminate toxemia. **She needed to be admitted, stabilized, immediately induced or a C-section, if induction was not possible, to get the baby out and to stop the process of preeclampsia. And that was not done.**

*Id.* at 1151 (emphasis in original).

The expert further opined that this deviation was a substantial factor in bringing about the decedent's death:

> Again, had **they** started the induction at that time and had **they** seen there was a failure in progress, in all probability, the fulminate aspect of the toxemia would not have occurred so rapidly.

*Id.* (emphasis added).

Additionally, the expert testified about another deviation from the standard of care when the hospital ignored Ms. Milton's prior records and sent her to a waiting area.

> All of the information [showing she needed induction immediately] was readily available and mandatory to be reviewed in a patient who presents at 350 pounds at 42 weeks for an induction. **None of that was done. And that is a deviation, number one, by anyone and everyone that had to do with the patient from the time of 7:30 on.**

*Id.* (emphasis in original). The failure to check on her every three to four hours also deviated from the standard of care. *Id.*

Finally, the expert opined that the hospital failed in its post-operative care by not providing the minimum prophylaxis to prevent DVT. "And that is

putting on the antithrombin and the doctors to initiate Heparin therapy.  And this was not done." *Id.* at 1152.   The failure to use these safeguards was a cause of death.

A second expert, independently and in conjunction with the first expert, confirmed the opinion that the hospital deviated from the standard of care and that these deviations were a substantial cause of Ms. Milton's death.

Having found that the estate met the first and third prongs of the *prima facie* case of corporate negligence through expert testimony, we proceeded to the final prong under the test announced in **Welsh** – *i.e.*, whether the hospital had actual or constructive notice of the defects or procedures creating the injury.  We concluded the hospital may properly be charged with constructive notice, because it should have known about the decedent's condition.  As we discussed, "in **Welsh**, our supreme court found that a *prima facie* case of corporate negligence had been established where the plaintiff's expert opined that the hospital nurses should have known there was a problem but failed to act on that knowledge." *Id.* (citing **Welsh**, 698 A.2d at 584).  As in **Welsh**, we found the hospital was also liable, because it must have known what was occurring but failed to act.  Further, we found **constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision.**

> Had [the hospital] undertaken adequate monitoring, it would have discovered that [Ms. Milton] had received and was continuing to receive medical treatment that was clearly deficient before and

after her delivery. We are compelled to find constructive notice under these circumstances.

*Id.*

Because the plaintiff made a *prima facie* case of corporate negligence under the third **Thompson** duty, we held that the trial court correctly allowed the matter to go to the jury. *Id.*

Here, like the plaintiffs in **Thompson** and **Whittington**, Mrs. Corey claims Wilkes Barre General Hospital breached the third duty of care required of hospitals: the duty to oversee all persons who practice medicine within its walls as to patient care. To prove her claims, she offered the testimony of Dr. Robert Paynter, an expert in the fields of emergency medicine and corporate responsibility. She claims his testimony followed the template set forth in **Whittington** to establish the first and third prongs of the *prima facie* case.

Regarding the first prong, Dr. Paynter opined that the hospital's emergency department "did not meet the standard of care" a hospital owes to a patient who presents in respiratory distress. N.T., 10/7/20, Trial part 2 at 35. He explained how and why the hospital should have done an arterial blood test and intubated Mr. Corey. Dr. Paynter testified as follows:

> So, you do the blood test. If they are in respiratory distress, you sedate them and you put them on a ventilator. That's what should have happened here. Instead, they waited. They waited. They tried to do other modalities. His respiratory rate this whole time was in the 40s [while the normal respiratory rate is 15 to 20].

*Id.*

This was a concern because Mr. Corey was breathing twice the rate of a normal person, which meant his respiratory muscles were getting exhausted. He could simply stop breathing from exhaustion. *Id.* at 39-40. The work of breathing can overcome the person; "that's why you do an elected intubation." *Id.* at 40.

The expert also informed the jury that:

The other problem is that if the $CO_2$ level is high and creating an acid situation, it's very dangerous for the body. In addition, [Mr. Corey] had infection which also adds to the acid level as well….

But you want to correct the respiratory acid by putting the tube in and ventilating the patient. Now, you can try and do it on the BiPAP, but **you have to do a blood gas test** to see that it's at 65 or 70, and it's supposed to be 40. **And you can repeat the test in an hour or even a half an hour and see if it is getting better. If it's not getting better, then you have [to] electively intubate.**

*Id.*

As Dr. Paynter opined, the hospital failed to monitor Mr. Corey's condition, to perform the necessary tests, and to intubate Mr. Corey in a timely fashion:

They didn't do any of that. They just placed [Mr. Corey] in a room, and he got progressively worse to the point where he reached the point of *in extremis*, is the term we use in medicine, and that's the time before you die. And he ripped his mask off, and he stopped breathing. And his blood pressure, his pulse, all stopped.

*Id*. at 40-41.

Dr. Paynter maintained that the standard of care was breached, because the hospital failed to take standard approaches in the industry to help Mr.

Corey who was in respiratory distress. "He was at the hospital for almost two hours before he stopped breathing. They needed to intervene. The simple way to intervene is an arterial blood gas, measure the abnormality, make a decision to intubate. That should have been done in this case."[3] *Id.* at 50.

Dr. Paynter also testified about the third prong of the corporate negligence test, that the hospital's conduct was a substantial factor in bringing about the harm. Dr. Paynter reviewed Mr. Corey's autopsy report, which indicated the factual cause of death was "lack of oxygen to the brain." *Id.* at 35. He opined that if Mr. Corey had been timely tested and intubated, he would have had a substantially greater chance at living:

> He should have survived this episode of bad pneumonia and he would have – you know, the ventilator would have gotten him through it. And he would have been – his respiratory acidosis would have been corrected. He would have received antibiotics. He would have probably had to stay on the ventilator for a day or two. And then he should have come off it, and he should have been okay.

*Id.* at 45. This testimony establishes causation.

Finally, Mrs. Corey maintains that under this theory of corporate negligence, (failure to oversee patient care - the third duty set forth in

---

[3] Dr. Paynter further opined that the hospital was not monitoring Mr. Corey closely and that "when he did finally peter out and stopped breathing on his own, they were not there to help him." N.T., 10/7/20, Trial part 2 at 51. He noted that Mr. Corey was unobserved for a period of 12 minutes after he took off his BiPAP mask before he coded. *Id.* at 46-47. More than likely that was the time that the significant amount of anoxic brain injury occurred. If he had been intubated prior to that, he would have been protected. He would have been on a ventilator [with alarms]. But none of that was in place. *Id.* at 47. This is a second reason why the hospital deviated from the standard of care.

- 11 -

*Thompson*), as in *Whittington*, the second prong of actual or constructive notice should be imposed upon the hospital at the nonsuit juncture of the case. Corey's Brief at 44; Corey's Reply Brief at 22-25. She relies on our precedent where we have held that "constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision." *Id.* (citing *Brodowski v. Ryave*, 885 A.2d 1045, 1057, 1059 (Pa. Super. 2005)). Mrs. Corey's case proceeded on an absence of supervision theory; she claims Mr. Corey was placed in a room and deteriorated under the care of the hospital, who should have been aware of his condition, but did nothing about it. He was left alone for at least twelve minutes before he coded. Under these circumstances, constructive notice should have been inferred for purposes of deciding whether she met her *prima facie* case.

Based on our precedents involving constructive notice, whether the failure to monitor Mr. Corey throughout his hospitalization was reasonable is a question of fact for the jury. *See e.g*., *Whittington*, 768 A.2d at 1154; *Welsh*, 698 A.2d at 586; and *Brodowski*, 885 A.2d at 1057, 1059. Actual notice asks what the hospital knew; constructive notice asks what the hospital *should have known* if they were properly monitoring the care of the patient.

Giving her the benefit of all reasonable inferences, I believe Mrs. Corey established sufficient evidence of all three prongs of corporate negligence under the third duty of *Thompson* (failure to oversee patient care). Because she met her *prima facie* case, I would reverse and remand for a new trial.

In my opinion, the trial court and the Majority erred in their analysis regarding the first and second prongs of the test for corporate negligence. With respect to the first prong, I believe the trial court did not give Mrs. Corey the benefit of all reasonable inferences when interpreting the expert testimony. The rules of civil procedure and our standard of review are critical:

> A trial court may enter a compulsory nonsuit on any and all causes of action if, at the close of the plaintiff's case against all defendants on liability, the court finds that the plaintiff has failed to establish a right to relief. Pa.R.C.P. No. 230.1(a), (c); **see Commonwealth v. Janssen Pharmaceutica, Inc.,** 8 A.3d 267, 269 n. 2 (Pa. 2010). Absent such finding, the trial court shall deny the application for a nonsuit. On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, **with appellant receiving "the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor.**" **Agnew v. Dupler**, 717 A.2d 519, 523 (Pa. 1998). The compulsory nonsuit is otherwise properly removed[,] and the matter remanded for a new trial.

**Scampone v. Highland Park Care Ctr., LLC**, 57 A.3d 582, 595–96 (Pa. 2012) (internal citations modified) (emphasis added).

Here, Mrs. Corey argues that the hospital and the trial court did not give her the benefit of every reasonable inference or resolve evidentiary conflicts in her favor. Corey's Reply Brief at 13-14. Mrs. Corey states that the evidence conflicts about whether Mr. Corey was improving or deteriorating during his stay at the hospital. The timing of events created a genuine issue of fact about the nature of his treatment and specifically, how long he was left alone and unattended. **Id**. at 15-18.

- 13 -

Additionally, the court found the expert's general criticism of the hospital and reference to "they" in his testimony was insufficient. As the court stated:

> Much of Dr. Paynter's testimony was given in generalized, non-specific terms of what he believed "they" should have done differently without identifying who "they" were. Since the "Wilkes-Barre General Hospital Emergency Department" is neither a person nor a legal entity and this was not a case of *res ipsa loquitor*, the only fair inference regarding who "they" were in the context of [the] testimony was Nurse Bond and Dr. Perry.

Trial Court Opinion, 6/21/21, at 6.

As Mrs. Corey argues, however, expert testimony critical of **unnamed nurses and resident physicians** is sufficient to support a corporate negligence claim. Corey's Brief at 44 (relying on **Whittington**, 728 A.2d at 1151). Thus, the detailed testimony of Dr. Paynter regarding what should have been done at the hospital was sufficient to establish the first prong of corporate negligence, that the hospital breached the standard of care. As noted above, a cause of action for corporate negligence arises from the policies, actions, or **inactions** of the institution itself rather than the specific acts of individual hospital employees. **Welsh**, 698 A.2d at 585.

Giving Mrs. Corey the benefit of every reasonable inference from Dr. Paynter's testimony, "they" should be interpreted to mean the hospital itself, in other words, its entire staff. Nevertheless, the trial court erred by resolving this inference against Mrs. Corey at the non-suit stage of the litigation. The court made a factual finding that Dr. Paynter meant only the nurse and doctor who directly treated her. In my view, the trial court thereby invaded the fact-finding province of the jury.

The Majority also evaluates only the actions of Nurse Bond but not the inactions of the hospital itself with respect to Mr. Corey's care. **See** Majority, **supra**, at 16-17. It repeats the error of the trial court. The chain of responsibility does not stop at the nurse and the doctor under a corporate-negligence theory. As in **Whittington**, the expert testified about what the hospital should have done but did not. Thus, the actions of Nurse Bond are only part of the equation. The jury should have been allowed to determine, as a matter of fact, whether the hospital itself was at fault for the quality of care it provided to Mr. Corey.

The trial court and Majority also erred in analyzing the second prong of the corporate-negligence test: namely, whether the hospital had actual or constructive notice of the defects or procedures which harmed Mr. Corey. The trial court found Mrs. Corey "provided no evidence that [the hospital] as an institution had actual or constructive notice of such negligence during the approximately twelve hours that Mr. Corey was treated there." Trial Court Opinion, 6/21/21, at 6. Based on lack of notice, the court concluded that Mrs. Corey did not establish the third duty under **Thompson**. However, because constructive notice may be imposed on a hospital in situations like this, where it is alleged that the lack of supervision caused the harm, proof of actual notice is not necessary. Granting a non-suit on this basis was an error.

The Majority believes constructive notice does not apply here. Like the trial court, it focuses only on evidence of "the individual decisions and actions of a doctor and nurse in conjunction with the care of a critically ill patient."

- 15 -

Majority at 16. Again, it essentially discredits Dr. Paynter's testimony on the omissions of the hospital in overseeing Mr. Corey's treatment. Ultimately, the Majority concludes Nurse Bond's conduct did not amount to an absence of supervision warranting the imposition of constructive notice. It distinguishes this case from **Welsh**, because Nurse Bond sought advice from the supervising doctor. **Id.** However, whether Nurse Bond's actions were appropriate and timely, whether other actions should have been taken by the hospital staff, or whether Mr. Corey was left unattended for too long under the circumstances, are all questions of fact for the jury. On a motion for a non-suit, the trial court must give the plaintiff the benefit of all reasonable inferences and conflicts in testimony. It did not do so here, and the Majority makes the same mistake.

As our caselaw has held, corporate negligence is distinct from the actions of the individual doctors and nurses. If there are steps that should be taken in a hospital and no one takes them, if a patient is unreasonably left to deteriorate, and the patient does deteriorate, then liability may attach; our law provides that a hospital itself has "a duty to oversee all persons who practice medicine within its walls as to patient care." **Thompson**, **supra**. Just as regular negligence is measured by the reasonable person standard, a hospital's negligence is measured against what a reasonable hospital under similar circumstances should have done. **See Edwards v. Brandywine Hosp.**, 652 A.2d 1382, 1386 (Pa. Super. 1995). Here, Dr. Paynter testified that a reasonable hospital would have acted differently. As a matter of law, this was enough to create a *prima facie* case of corporate negligence. It then

became a factual question for the jury to decide whether the hospital breached its duty of care for Mr. Corey.

The Majority cites **Ruff v. York Hosp.**, 257 A.3d 43 (Pa. Super. 2021), *reargument denied* (May 19, 2021), *appeal denied,* 266 A.3d 1064 (Pa. 2021), for its conclusion that this case did not involve "a kind of systemic negligence" on the part of the hospital. Majority at 16. In **Ruff**, however, the claim of corporate negligence was submitted to the jury. There, much like the facts here, the plaintiff alleged that the hospital was negligent for failing to perform a timely cardiac catheterization. **Ruff**, 257 A.3d at 48. The corporate negligence claim against York Hospital was based upon its purported failure to properly supervise the cardiologists, which contributed to a negligently timed cardiac catheterization. **Id.** Ultimately, the jury did not find the hospital negligent. As the trial court observed:

> Clearly, in this case the jury heard not only from the [appellant's] expert but also from the defense. The jury heard the defense view of what [York] did in order to oversee patient safety, and the jury was free to draw its own conclusions, which are fully supported by the evidence in the case, that [York] was not negligent.

> *  *  *

> With regard to the duty to oversee all persons who practice medicine, again, the jury was free to accept or reject the defense testimony that the policies that were in effect were designed to do that, and the jury obviously rejected [appellant's] theory or accepted the defense expert testimony on that issue.

- 17 -

*Id.* at 50-51.[4]  Because there was sufficient competent evidence to support the verdict and the verdict did not shock its conscience, the trial court denied the plaintiff's JNOV motion, and we affirmed.

Here, Mrs. Corey was denied the opportunity to have a jury evaluate the actions and inactions of the hospital, to determine whether it breached the duty it owed to her husband.  Moreover, we have held that "systemic negligence" need not be proven to establish a *prima facie* case of corporate negligence.  **Whittington**, **supra** at 1154.  Proving systemic negligence is certainly one way of establishing notice to the hospital, but it is not required. *Id.*  Where, as here, the hospital could have discovered that the patient was receiving deficient medical treatment, if it had been properly monitoring the patient's care, it may be properly charged with constructive notice for purposes of determining whether the plaintiff presented a *prima facie* case. *Id; see Edwards*, 652 A.2d at 1387 (to make out a viable **Thompson** claim, a plaintiff must prove that a hospital knew **or should have known** of the mistake or deficiency.)   In other words, when a plaintiff claims that the hospital failed to supervise the patient's treatment, what the hospital should have known under the circumstances becomes a jury question.

---

[4] Notably, that case also involved allegations that York breached the second and fourth duties owed under **Thompson**, **supra**.  The jury similarly rejected the corporate-negligence claim under those theories.

In sum, Mrs. Corey offered legally sufficient evidence to make a *prima facie* case for corporate negligence:  *i.e.*, that the hospital breached its duty to oversee all persons practicing medicine within its walls by failing to ensure appropriate testing and intubating of her husband as his condition continually deteriorated over several hours.  The trial court's imposition of a compulsory nonsuit on that cause of action was error.  Hence, I would reverse the order denying Mrs. Corey a new trial on her corporate-negligence claim and would remand for that purpose.[5]  I therefore respectfully dissent.

President Judge Panella and Judges McLaughlin and McCaffery join this dissenting opinion.

---

[5] Because I would grant Mrs. Corey relief on her first appellate issue, I express no opinion on her remaining claims of error.