2023 PA Super 262

| | | |
|---|---|---|
| LESLEY COREY, AS ADMINISTRATRIX OF THE ESTATE OF JOSEPH COREY, AND LESLEY COREY, IN HER OWN RIGHT | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 507 MDA 2021 |
| WILKES-BARRE HOSPITAL COMPANY, LLC, D/B/A WILKES-BARRE GENERAL HOSPITAL, WILKES-BARRE GENERAL HOSPITAL EMERGENCY DEPARTMENT AND J. CHARLES LENTINI, M.D. v. | : : : : : : : | |
| PENNSYLVANIA PHYSICIANS SERVICES, LLC | : : : | |
| Additional Defendant | : : | |

Appeal from the Judgment Entered March 24, 2021
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
2015-07551

BEFORE:  PANELLA, P.J., BOWES, J., OLSON, J., DUBOW, J., KUNSELMAN, J., MURRAY, J., McLAUGHLIN, J., KING, J., and McCAFFERY, J.

CONCURRING OPINION BY OLSON, J.:  **FILED: DECEMBER 11, 2023**

I agree that the judgment entered in favor of Appellee, Wilkes-Barre Hospital Company, LLC, d/b/a Wilkes-Barre General Hospital ("WBGH") should be affirmed for the reasons set forth in the learned Majority's Opinion.  I write separately, however, as I believe that prior case law addressing the corporate negligence doctrine as it applies to hospitals has created some confusion.

Nonetheless, when carefully analyzed, I conclude that prior precedent regarding the corporate negligence doctrine, particularly as it pertains to a hospital's duty to oversee its medical personnel, reaffirms that the trial court's decision to enter a nonsuit on Appellant's corporate negligence claim against WBGH was correct.

As noted by the Majority, our Supreme Court in **Thompson v. Nason**, 591 A.2d 703 (Pa. 1991) "first adopted the theory that a corporation, specifically a hospital, can be held directly liable for corporate negligence." **Welsh v. Bulger**, 698 A.2d 581, 585 (Pa. 1997). At the outset, the **Thompson** Court explained the doctrine of corporate negligence as follows:

> Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient. Therefore, an injured party does not have to rely on and establish the negligence of a third party.

**Thompson**, 591 A.2d at 707. In defining the contours of this theory, the Supreme Court channeled a hospital's duties into the following "four general areas:"

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Id*. (citations omitted).  The ***Thompson*** Court further instructed that, to hold a hospital directly liable under the newly-adopted theory of corporate negligence, a plaintiff must demonstrate that the "hospital had actual or constructive knowledge of the defect or procedures which created the harm" and that "the hospital's negligence [was] a substantial factor in bringing about the harm to the injured party."  ***Id***. at 708.  ***See Kennedy v. Butler Mem. Hosp.***, 901 A.2d 1042, 1045 (Pa. Super. 2006) (element of actual or constructive notice is critical because "the corporate negligence doctrine contemplates a kind of systemic negligence in the actions and procedures of the hospital rather than in the individual acts of its employees"). Hence, the ***Thompson*** Court, for the first time, held that a hospital had a responsibility to "ensure [a] patient's safety and well-being while at a hospital" and imposed liability directly upon a hospital if it "fail[ed] to uphold any of the . . . four [expressly enumerated] duties." ***Whittington v. Episcopal Hosp.***, 768 A.2d 1144, 1149 (Pa. Super. 2001), *citing* ***Thompson***, 591 A.2d at 707-708.

Since its inception, the "new concept of liability, *i.e.*, 'corporate liability', [as applied to hospitals] was recognized to be in tension with other theories of liability, namely, vicarious liability, including ostensible agency." ***Thompson***, 591 A.2d at 709 (J. Flaherty) (Dissenting Opinion).  In fact, in ***Thompson***, then-Justice, later Chief Justice Flaherty criticized the High Court's decision to "adopt[] an entirely new concept of liability" and apply it to hospitals "in order to hold them liable as guarantors of the quality of care afforded by independent staff members." ***Id***.  Chief Justice Flaherty's main

criticism was his belief that corporate liability, as outlined in **Thompson**, was "in every sense of the term an anomaly to established concepts of liability under respondeat superior." **Welsh**, 698 A.2d at 589 (C.J. Flaherty) (Dissenting Opinion).

In light of this inherent tension, appellate courts subsequently endeavored to "better discern the[] outlines" of **Thompson** by contrasting its "enumerated duties . . . with the well-established theories of vicarious liability." **Edwards v. Brandywine Hosp.**, 652 A.2d 1382, 1386 (Pa. Super. 1995). In so doing, this Court explained when a hospital will be held directly liable under the doctrine of corporate liability as enunciated in **Thompson**. As the Majority acknowledges, we previously stated:

> The **Thompson** theory of corporate liability will not be triggered every time something goes wrong in a hospital which harms a patient. Acts of malpractice occur at the finest hospitals, and these hospitals are subject to liability under theories of respondeat superior or ostensible agency. To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, **Thompson** requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard. This requires evidence that the hospital knew or should have known about the breach of duty that is harming its patients.
>
> Thus, a hospital is not directly liable under **Thompson** just because one of its employees or agents makes a mistake which constitutes malpractice. Just as regular negligence is measured by a reasonable person standard, a hospital's corporate negligence will be measured against what a reasonable hospital under similar circumstances should have done. **Thompson** contemplates a kind of **systemic negligence**, such as where a hospital knows that one of its staff physicians is incompetent but lets that physician practice medicine anyway; or where a

> hospital should realize that its patients are routinely getting infected because the nursing staff is leaving catheters in the same spot for too long, yet the hospital fails to formulate, adopt or enforce any rule about moving catheters. ***Thompson*** does not propound a theory of strict liability, a theory that [the appellant's] brief argues and the trial court found so disturbing. **Though broadly defined, *Thompson* liability is still fault based.**

***Edwards,*** 652 A.2d at 1386–1387 (internal citations omitted, emphasis added). Pennsylvania courts, in recognition of the foregoing, have limited recovery for corporate negligence to instances in which a plaintiff demonstrates "systemic negligence" on the part of a hospital. ***Id.***; ***see also Welsh***, 698 A.2d at 585 ("A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees"); ***Boring v. Conemaugh Memorial Hosp.***, 760 A.2d 860, 861 (Pa. Super. 2000) (holding that the plaintiff simply established "that the nurses failed to act appropriately in this case" and failed to show "'systemic' negligence" on the part of the hospital and, as such, the trial court correctly declined to charge the jury on corporate negligence).

Four years after our Supreme Court decided ***Thompson,*** this Court decided ***Edwards, supra***. Our decision in ***Edwards*** serves as an example of how this Court differentiates systemic hospital corporate negligence as required by ***Thompson*** from ordinary negligence. In ***Edwards***, the plaintiff, Charles Edwards, a 69-year-old man with an artificial hip, arrived at the Brandywine Hospital emergency room complaining of hip pain. Edwards was

admitted to the hospital, "and the nursing staff installed a heparin lock on his left hand" which "allow[ed] multiple intravenous fluids to be introduced at a common point." *Edwards* 652 A.2d at 1383. Edwards stayed at Brandywine Hospital for five days and, during his stay, the heparin lock was left in place on his hand for three or four days. After his discharge, Edwards noticed a red spot on the back of his hand where the heparin lock had been located. Edwards returned to the hospital emergency room, wherein a doctor examined his hand, obtained a sample of pus for analysis, and sent Edwards home with a prescription for oral antibiotics. It was later revealed through lab tests that Edwards had a staphylococcus aureus ("staph") infection. The physician that treated Edwards in the emergency room "placed the lab results in diagnosis in [his] chart, as required by hospital rules." *Id.*

A few days later, Edwards returned to the hospital complaining of leg pains. He stayed at the hospital for a week because the attending physician "did not notice the recent diagnosis of staph infection in his chart." *Id.* Ultimately, additional lab testing was ordered, which again showed the presence of a staph infection. This time, the doctor ordered the administration of intravenous antibiotics to Edwards. Edwards was then discharged as the doctor believed that the infection had been eradicated. A week later, Edwards returned to the hospital with pain and a fever. At this time, the doctors believed that the staph infection was not fully treated and had spread to Edwards' artificial hip. After a month-long stay at the hospital, Edwards was discharged but, over the course of the next two years, he endured more

treatment and hospitalizations. Eventually, to treat the infection, the doctors removed Edwards's artificial hip and administered massive doses of antibiotics. As a result, Edwards required crutches or a walker to ambulate. Thereafter, Edwards brought suit against Brandywine Hospital seeking recovery for, *inter alia*, corporate negligence. The case proceeded to trial but, at the close of Edwards' case-in-chief, the trial court granted Brandywine Hospital's motion for directed verdict. In so doing, the court held that the hospital could not be found liable under the theory of corporate negligence adopted by **Thompson**. Edwards appealed.

In reviewing Edwards' claim of error, this Court initially recognized that, to recover under **Thompson** a plaintiff must demonstrate "a kind of systemic negligence." **Id**. at 1387. We then noted that Edwards' "specific claims," for the most part, "amount[ed] to no more than individual acts of negligence for which the hospital, as a corporate entity, could not be held directly liable." **Id**. Importantly, Edwards set forth the following five claims: (1) "the [emergency room] doctor who examined his hand should have immediately put him on intravenous antibiotics;" (2) "the hospital's laboratory notification procedure was deficient" because his treating physicians failed to notice the lab report for at least a week which indicated that he had a staph infection; (3) "the hospital was deficient for adopting a rule allowing its physicians complete discretion in deciding when to consult experts;" (4) the hospital discharged him prematurely; and (5) the hospital's rule "allowing catheters to

be left in place for as long as 72 hours ["72-hour rule"]" was inappropriate. *Id.* at 1387-1388.

Ultimately, this Court held that, based upon the evidence presented, the trial court correctly granted Brandywine Hospital's motion for directed verdict with respect to Edwards' first four claims of corporate negligence. In particular, the Court held that Edwards' first, second, and third theories of liability failed because he did not introduce any evidence that the hospital "knew or should have known" of its providers' alleged negligence or "that a reasonable hospital would have intercepted and corrected [said errors]." *Id.* at 1387. Without this proof, the Court concluded that Edwards failed to demonstrate the type of "systemic negligence" contemplated by *Thompson*. *Id.* Importantly, and as relevant herein, this Court reached a similar conclusion regarding Edwards' fourth claim of error, *i.e.,* that the hospital discharged him prematurely. We stated:

> The discharge claim is similar. [] Edwards may have been able to prove that his physicians discharged him prematurely. He may have been able to convince a jury that he was discharged because his Medicare hospitalization coverage was exhausted. But the decision to discharge [] Edwards was made by a single physician, not the hospital as a corporate entity. Thus, the hospital cannot be held liable for a discharge error absent proof that it knew that [] Edwards' discharge was premature, or that its physicians were regularly making bad discharge decisions.

*Id.* at 1387-1388. This Court, however, held that Edwards' fifth theory of liability was the "only properly developed *Thompson* claim" because it

"concerned the hospital's rule for moving intravenous catheters." *Id.* at 1388.

It explained:

> This situation implicates not just an individual mistake, but the hospital's duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for its patients. If [] Edwards could prove that the 72-hour rule was inadequate, that the hospital should have known better, and that following this rule caused him harm, then he has made out a proper **Thompson** claim.

*Id*. (parallel citations, internal quotations and quotation marks omitted). The

**Edwards** Court, therefore, held that the trial court erred in directing a verdict

with regard to Edwards' final claim.[1] *Id*.

In a pair of cases issued after **Edwards**, this Court appears to have

endorsed an alternate path toward recovery under the theory of corporate

hospital negligence, one which recognized repeated – but perhaps not

systemic – violations of **Thompson**'s oversight duty. I believe that, at this

time, this Court was confronted with factual scenarios that, if not properly

interpreted and confined, could result in the convergence of the doctrines of

corporate negligence and vicarious liability as Chief Justice Flaherty feared.

In **Whittington, supra**, the estate of decedent, Claudette E. Milton,

brought a wrongful death and survivorship action against Episcopal Hospital

based upon the care it provided to Milton during her pregnancy and childbirth.

---

[1] Importantly, this determination related to the hospital's duty to formulate rules and policies to ensure a patient's quality care, not a hospital's duty to oversee its' medical personnel as relevant herein. **See Thompson**, 591 A.2d at 707.

During her pregnancy, Milton was treated by Dr. Carol Allen. On December 15, 1993, Milton was evaluated by Dr. Allen and, during her visit, complained of lightheadedness, abdominal swelling, heartburn and leg pain. Ultimately, Milton was diagnosed with pregnancy induced hypertension ("PIH"). "Notwithstanding the PIH diagnosis and the need to have labor induction initiated immediately," Milton was "sent home with only a prescription for iron supplements, which did not relate to the treatment for PIH." *Whittington*, 768 A.2d at 1146. Moreover, "[n]o one at Episcopal [Hospital] advised [her] of the risk of PIH, even in light of a documented family history of PIH." *Id.*

Seven days later (December 22, 1993), Milton again visited Dr. Allen. This time, Milton lodged complaints of irregular contractions. Subsequent testing revealed a "clearly elevated blood pressure" as well as +2 proteinuria.[2] *Id.* Again, "[n]otwithstanding the [aforementioned results], which should have mandated immediate initiation of labor induction, Episcopal [Hospital's] staff neither admitted [] Milton, nor even questioned Dr. Allen's instructions that [Milton] go home and wait until December 23, 1993 for labor induction." *Id.* at 1146-1147.

On December 23, 1993, Milton arrived at Episcopal Hospital for labor induction and was admitted at 7:30 a.m. A review of her prior records would have shown her diagnosis of PIH, which necessitated she be sent immediately

---

[2] Proteinuria is a condition in which abnormally high quantities of protein are detected in the urine. The condition may indicate damage to the kidneys. HTTPS://my.clevelandclinic.org/health/diseases/16428-proteinuria (last visited 10/12/23).

to labor and delivery ("L&D") for induction. However, Milton's records were ignored and she was sent to the waiting room where, in violation of the hospital's own policy, she "was essentially ignored for close to 14 hours." **Id.** at 1147. At 9:00 p.m., Milton, still in the waiting room, complained of headaches and her blood pressure was elevated to 181/100. As such, Milton was finally transferred to L&D for induction. While in L&D, Milton showed "consistently elevated blood pressure throughout the night but blood pressure lowering drugs, essential for her condition, were not ordered until 7:00 a.m. the next morning" and "were not administered to her until 8:40 a.m." **Id.** At this time, Milton's condition deteriorated further.

At 11:30 a.m., December 24, 1993, Milton was rushed to the operating room for an emergency cesarean section. The procedure, however, was delayed at least an hour and was ultimately performed "under clearly unfavorable conditions" as Episcopal Hospital's staff "did not order the necessary [deep vein thrombosis ("DVT")] prophylaxis . . . or even put antithrombin hoses on [her]." **Id.** This resulted in blood clots forming in Milton's lungs. Following her cesarean section, Milton briefly regained consciousness, but her condition continued to deteriorate, resulting in a transfer to the intensive care unit ("ICU"). Milton's time in the ICU was met with continued incompetent care, causing her to develop Adult Respiratory Distress Syndrome. Milton died on January 4, 1994. Her estate brought an action against Episcopal Hospital, asserting various claims, including corporate liability. The matter proceeded to a jury trial, wherein the jury concluded that

Episcopal Hospital was corporately liable for Milton's death. Episcopal Hospital appealed to this Court.

On appeal, Episcopal Hospital argued that Milton's estate failed to establish a *prima facie* case of corporate negligence and, as such, it was entitled to judgment notwithstanding the verdict ("JNOV"). This Court disagreed, concluding that Milton's estate established that "Episcopal [Hospital] failed in its duty to oversee all persons who practice medicine within its walls as to patient care, the third duty enumerated in ***Thompson***." ***Id.***

In reaching this conclusion, the ***Whittington*** Court noted that Milton's estate established, through expert testimony, that Episcopal Hospital "deviated from the standard of care on the [15th, 22nd, 23rd, and 24th] of December [] 1993, as well as in rendering post[-]delivery medical care to [Milton]." ***Id.*** at 1150. In particular, the estate's expert opined that, on December 15th and 22nd, the conduct of the health care providers at Episcopal Hospital fell below the standard of care because, despite recognizing that Milton was at term, was diagnosed with PIH and showing "classic symptomology of toxemia or preeclampsia," Milton was allowed to go home without a complete evaluation and told to return for induction eight or nine days later. ***Id.*** The expert claimed that this failure substantially caused Milton's death because Milton "needed to be delivered." ***Id.*** at 1150. If Milton were delivered at this time, the expert believed that "the fulminate aspect of the toxemia would not have occurred so rapidly," and that Milton "would have had a successful delivery[] and would be alive today." ***Id.*** at 1150-1151.

In addition, the expert opined that, at the time Milton presented for induction of labor on December 23rd through the delivery of the baby on December 24th, "the standard of care did not improve." *Id.* at 1151. Chiefly, the expert criticized the fact that Episcopal Hospital ignored Milton's prognosis of PIH as set forth in her records and sent her to the waiting room for approximately 14 hours.

> All of the information [showing the need for immediate induction] was readily available and mandatory to be reviewed in a patient who presents at 350 pounds at 42 weeks for an induction. None of that was done. And that is a deviation, number one, by anyone and everyone that had to do with the patient from the time of 7:30 [a.m.] on.

*Id.* (emphasis omitted). As a result of the aforementioned failures, the expert opined that Episcopal Hospital performed Milton's cesarean section "under the worst conditions." *Id.* at 1152 (emphasis omitted).

> And by the time they finally delivered this patient, [her preeclampsia] was not only fulminate, it was life threatening, because that patient was so sick. She now had her lungs filled with fluid, called pulmonary edema; she [is] having a major operation in the worse possible circumstances, with blood pressures out of control, pulmonary edema, fluid in the lungs, a baby that [is] in trouble. This is the worst[-]case scenario that you can put yourself into. And it did not have to happen.

*Id.* (emphasis omitted). Finally, the expert criticized Episcopal Hospital's post-operative care, noting that they failed to "provide the minimum prophylaxis to prevent [DVT]." *Id.* The expert concluded that Milton's death was caused by all of the failures set forth above.

Ultimately, the ***Whittington*** Court determined that, based upon Episcopal Hospital's "numerous and recurring deviations from the standard of care," Milton's estate did, in fact, establish that Episcopal Hospital violated ***Thompson***'s oversight duty, which caused Milton's untimely death. ***Id.*** at 1153; ***see also id.*** ("While some of Episcopal [Hospital's] numerous negligent acts acts/omissions would help support a finding of corporate negligence under more than one of the four enumerated duties, our review concerns **the cumulative nature of the conduct used to establish corporate negligence** under the third duty in ***Thompson***.") (emphasis added).  This Court also held that Milton's estate established that Episcopal Hospital had constructive notice of the defects or procedures creating Milton's injury. Specifically, the ***Whittington*** Court concluded that Episcopal Hospital could "properly be charged with constructive notice since it should have known of [Milton's] condition." ***Id.***  It stated:

> Had Episcopal [Hospital] undertaken adequate monitoring, it would have discovered that [Milton] had received and was continuing to receive medical treatment that was clearly deficient before and after her delivery.  We are compelled to find constructive notice under these circumstances.

***Id.***

This Court's ruling in ***Whittington*** aligns with another decision of this Court, also issued subsequent to ***Edwards***.  In ***Shannon v. McNulty***, 718 A.2d 828, 836 (Pa. Super. 1998), Sheena Evans Shannon was a subscriber of the HealthAmerica Health Maintenance Organization ("HealthAmerica HMO"),

when she became pregnant. Through HealthAmerica HMO, Shannon chose Larry P. McNulty, M.D. to serve as her OB/GYN. Importantly, HealthAmerica HMO instructed her to either contact her physician or HealthAmerica HMO in the event of medical questions or medical emergencies.

On October 2, 1992, when Shannon was approximately five months pregnant, Shannon called Dr. McNulty complaining of abdominal pain. On October 5, 1992, Shannon had an appointment with Dr. McNulty, wherein he briefly examined her and concluded Shannon's pain was due to a fibroid uterus. He did not conduct any additional testing to confirm this diagnosis. Thereafter, Shannon proceeded to call Dr. McNulty's office on October 7th, October 8th, and October 9th, 1992, because of continuing abdominal pain, back pain, constipation and the inability to sleep. During her call on October 8, 1992, Shannon informed Dr. McNulty that her pains were irregular and about ten minutes apart. As such, Shannon asked Dr. McNulty if she could be in pre-term labor. Dr. McNulty stated she was not in pre-term labor, basing this statement on his examination on October 5, 1992. On October 10, 1992, Shannon called HealthAmerica HMO's emergency line, informing them of her "severe irregular abdominal pain, back pain, that her pain was worse at night, that she thought she may be in pre-term labor, and about her previous calls to Dr. McNulty." *Id.* at 832. The triage nurse on the emergency line directed Shannon to call Dr. McNulty.

On October 11, 1992, Shannon called HealthAmerica HMO's emergency line again, stating her symptoms continued to worsen, and Dr. McNulty was

not responding. Again, the triage nurse directed Shannon to call Dr. McNulty. Shannon did so, informed Dr. McNulty of her symptoms, and, for the second time, relayed her fear that she was in pre-term labor. Dr. McNulty "was again short with her" and angrily insisted that she was not in pre-term labor. *Id.* Finally, on October 12, 1992, Shannon called HealthAmerica HMO's emergency line, "told the nurse about her symptoms, severe back pain and back spasms, legs going [numb], more regular abdominal pain, and [that] Dr. McNulty was not responding to her complaints." *Id.* A HealthAmerica HMO orthopedic physician ultimately spoke with Shannon and directed her to go to West Penn Hospital, which was approximately an hour away from her home. Shannon obliged, passing three other hospitals on her way to West Penn Hospital. At West Penn Hospital, Shannon delivered a one and one-half pound baby boy who survived for two days.

Shannon and her husband, in their own right and on behalf of their son's estate, brought suit against, *inter alia*, HealthAmerica HMO. Of relevance, the Shannons alleged that HealthAmerica HMO was liable under the theory of corporate negligence for its "negligent supervision of Dr. McNulty's care." *Id.* at 829. The matter proceeded to a jury trial, but the trial court ultimately nonsuited the Shannons' claims. They appealed to this Court.

This Court reversed the trial court's grant of nonsuit, concluding that the Shannons set forth sufficient evidence to sustain a claim of corporate negligence. Initially, the Court reviewed the testimony of the Shannons'

expert, Stanley M. Warner, M.D.  When asked whether HealthAmerica HMO deviated from the standard of care, Dr. Warner stated:

> I believe they did deviate from the standard of care.  I believe on each occasion of the calls on October 10th, 11th, and October 12th, that [] Shannon should have been referred to the hospital, and the hospital notified that this woman was probably in pre[-]term labor and needed to be handled immediately. They did have the alternative of calling for a physician, if they wanted to, for him to agree with it, but basically she needed to be evaluated in a plac[e] where there was a fetal monitor and somebody to do a pelvic examination to see what was happening to her.

*Id*. at 834.  Dr. Warner further opined that this deviation "increase[d] the risk of harm to the baby, and definitely decreased the chance of [the baby] being born healthy."  *Id*.  Based upon the foregoing testimony, the *Shannon* Court concluded that the Shannons did, in fact, present sufficient evidence to establish a *prima facie* case that HealthAmerica HMO breached *Thompson*'s third duty and, in so doing, caused the Shannons' child's untimely death.

This Court's holdings in *Whittington* and *Shannon*, at first blush, may appear a bit inconsistent with the holding in *Edwards*.  Upon a thorough review, however, it is apparent that, unlike in *Edwards*, this Court in both *Whittington* and *Shannon* confronted medical personnel who provided inadequate care over extended periods of time and who "regularly ma[de] bad discharge decisions."  *Edwards*, 652 A.2d at 1288.  Hence, as we indicated in *Edwards*, this Court in *Whittington* and *Shannon* recognized that the medical providers' "numerous and repeated deviations from the standard of care" amounted to systemic negligence that can and, ultimately, did give rise

to corporate negligence liability on the part of the hospital. *Whittington*, 76 A.2d at 1153; *see also Shannon*, *supra*. Taken together, therefore, it appears that *Edwards*, *Whittington* and *Shannon* consistently hold that a plaintiff sets forth sufficient evidence to sustain a cause of action of corporate negligence based upon a violation of *Thompson*'s oversight duty if he or she demonstrates systemic shortcomings in diagnostic or treatment practices, such as where patient care and safety are negligently overlooked and/or ignored despite repeated presentations over extended periods of time until it is too late to act.

Importantly, this Court's recent decision in *Ruff v. York Hospital*, 257 A.3d 43 (Pa. Super. 2021) serves as a prime example of the application of corporate negligence within the confines outlined above. In *Ruff*, Linda J. Shifflet, presented to Hanover Hospital on May 24, 2014, complaining of shortness of breath. A Hanover Hospital emergency department physician, Dr. Micheal Denney, determined that Shifflet had a small heart attack with some fluid in her chest, which caused congestive heart failure. Due to concerns that Shifflet might require a heart catheterization, Dr. Denney requested she be transferred to York Hospital. Once admitted to York Hospital, Shifflet was examined by Dr. Lyle Siddoway, who later determined that Shifflet's congestive heart failure and respiratory weakness contra-indicated that she was stable enough to undergo a catheterization procedure that day. Dr. Siddoway, as well as Dr. Gregory Fazio, monitored Shifflet during the following week but continued to conclude that the risks of

catheterization outweighed the benefit of performing the procedure. On June 1, 2014, Shifflett went into cardiogenic shock. A catheterization was performed revealing coronary artery blockage, and bypass surgery was performed. On June 7, 2014, Shifflet died.

Shifflet's estate instituted a wrongful death and survival action against York Hospital alleging, *inter alia*, corporate negligence on the part of York Hospital. The matter proceeded to a jury trial. Ultimately, the jury returned a verdict in favor of the hospital. The estate filed a post-trial motion, requesting a new trial and JNOV, which the trial court denied. The estate then lodged an appeal in this Court.

On appeal, the estate claimed it was entitled to a new trial and/or JNOV on the corporate negligence claim because York Hospital breached **Thompson**'s oversight duty by failing to supervise the physicians responsible for Shifflet's care. In particular, the estate argued that it demonstrated that "York [Hospital's] failure to 'monitor and oversee the medical care of . . . Shifflet at the point of care so as to obtain and require a timely, definitive diagnosis of her obstructive coronary artery disease' constituted a diagnostic error causing Shifflet's death." **Id.** at 53. This Court disagreed.

First, the **Ruff** Court noted that the estate's theory that **Thompson**'s oversight duty encompassed point-of-care supervision was unsupported. In particular, this Court stated:

> [The estate] offered no authority, nor has our independent research discovered, any decision interpreting **Thompson**'s

oversight duty to mandate that a hospital direct or override a physician's clinical judgment.

*Id*. at 54. Second, the **Ruff** Court noted that the estate's theory of point of care supervision was rejected by the jury. It stated:

> Clearly, the jury accepted the testimony of York [Hospital's] witnesses that it fulfilled its oversight duty and rejected [the estate's] position that the hospital was charged with mandating or superseding physicians' clinical judgment.

*Id*. Shifflet's presentation and weeklong hospital stay established a sufficient factual basis to submit the estate's corporate negligence claim to a jury and allowed the jury to consider whether the facts demonstrated systemic or recurring departures from the standard of care pertaining to personnel oversight for which the provider hospital could be held directly liable. Despite this, we squarely rejected the estate's contention that a defendant hospital **must** be held directly liable where it simply fails to supersede or override the clinical and/or diagnostic judgments of its medical personnel. In other words, Shifflet's estate presented sufficient evidence to support the submission of the oversight claim to the jury, but the hospital's mere failure to countermand the clinical and diagnostic decisions of Shifflet's individual treatment providers was not sufficient to compel us to set aside the findings of the jury.

It is therefore apparent that, based upon all the foregoing, the viability of a claim of corporate negligence based upon a violation of **Thompson**'s oversight duty is factually specific. It is, however, important to recognize that, since its inception, corporate negligence has always been considered to be fault based. **Edwards**, 652 A.2d at 1387 ("**Thompson** does not propound a

theory of strict liability . …  Though broadly defined, **Thompson** liability is still fault based.").  In other words, "a plaintiff [must] show that the hospital itself is breaching a duty and is somehow substandard."  **Id.**  at 1386.  Vicarious liability, on the other hand, is not based upon a violation by the hospital but, instead, is imposed upon a hospital based upon a showing that a medical provider which it employs acted negligently or otherwise departed from the standard of care.  Thus, to distinguish a claim of corporate negligence based upon a violation of **Thompson**'s oversight duty from that of vicarious liability, the law must insist that there be evidence that implicates or triggers the hospital's duty as a corporation to take corrective action to address the behavior or conduct of its personnel.  **See Edwards**, 652 A.2d at 1387 (explaining that Edwards failed to introduce evidence "that a reasonable hospital would have intercepted and corrected" the medical provider's errors).  To me, this requires a showing of "numerous and repeated deviations from the standard of care" by hospital personnel.  **Whittington**, 76 A.2d at 1153; **see also Shannon**, **supra**.  Such conduct over a period of time would allow health care providers, namely, nurses, sufficient time to observe and "go to their supervisor[s] and inform [them of the] problem[s] that [] developed" and, in turn, an opportunity for hospital supervisors to implement corrective action.[3] **Whittington**, 768 A.2d at 1150.  I believe our prior cases require

_____

[3] There may be some instances where the repetition or duration required may be diminished, such as where a departure from the standard of care involves
*(Footnote Continued Next Page)*

- 21 -

_____

a treatment or clinical assessment about which there can be little or no difference of opinion.  Our Supreme Court's decision in **Welsh**, **supra**, serves as an example of this.  In **Welsh**, the appellant, Bobbi Jo Welsh, received prenatal care from Donald W. Bulger, M.D.  At that time, Dr. Bulger "had obstetrical privileges at Nason Hospital but these privileges did not permit him to perform surgery at the hospital."  **Welsh,** 698 A.2d at 583.  On January 1, 1990, at around 4:00 a.m., Welsh went into labor.  She arrived at Nason Hospital at 12:00 p.m., but wasn't examined by Dr. Bulger until 7:55 p.m. when he "placed an internal monitoring device on the fetus to monitor the fetal heart rate."  **Id.**  By 8:15 p.m., Welsh's cervix became fully dilated and "Dr. Bulger instructed her to begin pushing out the baby."  **Id.**  "By 9:13 p.m., the fetal monitoring device indicated that the fetal heart rate had experienced consecutive nonassuring variable deceleration patterns, suggesting possible interference of umbilical blood flow to the fetus."  **Id.**  This continued until monitoring was discontinued around 9:38 p.m.  Eventually, "Dr. Bulger vaginally delivered the child with forceps at approximately 10:35 p.m." at which time "the child was dusky in color, was lacking in muscle tone, was without spontaneous respiration, and had a low heart rate."  **Id.**  The child then underwent multiple hospitalizations and suffered numerous complications.  The child died 11 months later.

Welsh later brought suit against, _inter alia_, Nason Hospital, raising claims of vicarious and corporate liability.  Of relevance, Welsh claimed that Nason Hospital was corporately liable because "it granted non-surgical obstetrical privileges to Dr. Bulger without requiring a qualified surgeon to be available in case surgery was necessary and because its staff failed to notify the hospital that Welsh's child needed a surgical delivery."  **Id.**  Welsh presented various experts in support of her claims.  Her final expert, Stanley M. Warner, M.D. stated that, based upon the fetal monitoring read out, a need for a surgical delivery was apparent.  In particular, he opined:

> I have reviewed the materials you sent me regarding the care of Bobbi Jo Welsh.  I find that her care was below the standard of care.
>
> At about 20:30 hours on January 1, 1990, recurrent late decelerations or variable decelerations with late components appear consistently on the fetal monitor record. Bobbi Jo Welsh did not deliver [the child] until 22:35 hours on January 1, 1990. There was no reason to believe at 20:30 hours that there would

_(Footnote Continued Next Page)_

be rapid delivery of Kyle. Bobbi Jo Welsh was a [16-year-old] *prima gravida* [(first-time pregnancy)] and her labor was progressing approximately normally for a *prima gravida*. By that estimate, it would have been at least two more hours before one would have expected delivery from the 20:30 hour time, which, of course, is what did happen. In fact, that is rather on the rapid side. The nurses must have known what was going on. An internal scalp led [sic] was placed on 7:55 a.m. There was oxygen from 9:30 p.m. or 21:30 hours.

It is apparent from Dr. Bulger's deposition that he was not qualified to perform cesarean sections and failed to have anyone in that could perform cesarean sections. He also did no consultation for cesarean section. If Dr. Bulger had arranged for an appropriate cesarean section or the hospital had arranged for an appropriate cesarean section with the nurses' input on this, there is every reason to believe that [the child] would be an absolutely normal child today. There also should have been a pediatrician available for the resuscitation and there was not.

*Id.* at 584.

Ultimately, Nason Hospital moved for summary judgment, "arguing that there was no issue to be tried concerning its liability because Welsh's expert reports failed to support her claims." *Id.* The trial court granted summary judgment and dismissed Nason Hospital from the action. Welsh appealed. Ultimately, our Supreme Court reversed the trial court's order granting summary judgment. In particular, the High Court determined that, based upon Dr. Warner's expert testimony, Welsh sufficiently supported her claims of corporate negligence against Nason Hospital. *Id.* at 586. Importantly, the Court held that, because Dr. Warner "opined that the nurses breached the standard of care because they must have known that there was a problem with the delivery but failed to act on that knowledge," his report was "sufficient to support a *prime facie* case of corporate negligence against Nason Hospital for violation of its duty to "oversee all persons who practice medicine within its walls as to patient care." *Id.*

*Welsh*, therefore, is an example of a set of circumstances where a reduced margin of judgment or difference in opinion allows us to impute corporate liability to a hospital despite a diminished duration or reduced incidence of deviation from the standard of care. Indeed, the *Welsh* Court readily agreed with Dr. Warner's expert opinion that the nurses "must have known that there
*(Footnote Continued Next Page)*

such a showing and forbid holding a hospital corporately liable for the individual negligent acts of its medical personnel, a basis for compensation which already exists under the doctrine of vicarious liability.

In the case *sub judice*, when considering the facts and contentions presented by Appellant in light of the teachings of **Edwards**, **Whittington**, **Shannon**, and **Ruff**, I am compelled to conclude that the trial court correctly entered a nonsuit on Appellant's claims of negligent corporate oversight. Appellant's allegations of corporate negligence in this case are based exclusively upon a single admission to WBGH and the conduct of its medical personnel on **one** day: August 9, 2013.  Indeed, Appellant did not present any evidence that, over the course of days, weeks, or months, WBGH overlooked or ignored numerous or repeated departures from the standard of care by its health care providers who treated Joseph Corey.  In other words, Appellant failed to prove that WBGH had corporate knowledge of numerous or recurring departures from the standard of care sufficient to establish "systemic negligence."  I therefore concur with the Majority that Appellant did not present sufficient evidence to submit her claim of corporate negligence to the jury.

---

was a problem with the delivery" because, in this particular scenario, the signs of fetal distress, coupled with Dr. Bulger's lack of license status, compelled one conclusion: Welsh needed the assistance of a medical provider able to perform cesarian sections.  **Id.** at 584.  Hence, in a similar situation, *i.e.*, in circumstances where the room for difference of opinion is narrow, the duration or frequency of medical error before a hospital's corporate duty is triggered could be limited.

Before I conclude, however, I must briefly address the Dissent's suggestion that we reverse the trial court's order granting nonsuit in favor of WBGH and remand for a new trial. Initially, the Dissent argues that Appellant's expert, Robert Paynter, M.D., provided "detailed testimony . . . regarding what should have been done at [WBGH]," namely, that WBGH erred in failing to conduct an arterial blood test and intubating Decedent and that such testimony "was sufficient to establish . . . that [WBGH] breached the standard of care" and played a substantial role in Decedent's death. Dissenting Opinion at 14; *see also id*. at 9 and 11. Then, the Dissent asserts that, because Appellant "proceeded on an absence of supervision theory," *i.e.*, she claimed that Decedent was "placed in a room and deteriorated under the care of [WBGH]" because he was left "alone for at least [12] minutes before he coded," constructive notice "should be imposed upon [WBGH] at the nonsuit juncture of the case." *Id*. at 12. Hence, in light of two alleged lapses in clinical judgment by Corey's providers and a 12-minute stay in a treatment room, the Dissent contends that Appellant "established sufficient evidence of all three prongs of corporate negligence under the third duty of *Thompson* (failure to oversee patient care)" and, as such, the trial court should have submitted Appellant's corporate negligence claim against WBGH to the jury. *Id*.

The Dissent, in my view, adopts the position that a corporate negligence claim must be submitted to the jury if a plaintiff offers even a bare minimum of proof tending to show that a hospital failed to override an isolated clinical

assessment or onetime treatment determination made by a member of its medical staff. This position is flawed for several reasons. First, it is undermined by the cited appellate case law. Indeed, my learned colleagues rely on **Thompson** as well as **Whittington**, both of which involve plaintiffs that presented to the respective hospitals several times over the course of approximately one week (**Thompson**) or longer (**Whittington**), but were either ignored by hospital personnel or met with repeated negligent care. No such evidence was presented in this instance. Second, the Dissent renders as obsolete the "critical role" a trial judge must play during a jury trial, which is to "act as a gatekeeper to ensure that each theory presented to the jury . . . [is] warranted by the evidence at trial." **Timmonds v. AGCO Corporation**, 2021 WL 1351868 *1, *34 (Pa. Super. 2021). Lastly, the disposition proposed by the Dissent perpetuates the confusion surrounding the doctrine of corporate negligence and nullifies the doctrine's fault-based underpinnings, just as Chief Justice Flaherty feared. The crux of Appellant's case-in-chief was that WBGH personnel failed to preform one test, an arterial blood test, and later, at some point, left the Decedent's bedside for a mere 12 minutes. These facts are simply insufficient to sustain an action for **systemic** corporate negligence. Thus, the trial court correctly entered a nonsuit on Appellant's corporate negligence claim against WBGH.

Judges Bowes and Dubow join this Concurring Opinion.